**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Jo Ann WILLIAMS, Defendant-Appellee.**

No. 78–1725.

United States Court of Appeals, Fifth Circuit.

July 31, 1980.

---

William L. Harper, U. S. Atty., C. Michael Abbott, Asst. U. S. Atty., Atlanta, Ga., Ann. T. Wallace, Mervyn Hamburg, Attys., App. Sect., Crim. Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

John A. West, Cincinnati, Ohio, for defendant-appellee.

Jo Ann Williams, pro se.

Before COLEMAN, Chief Judge, and BROWN, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.[*]

PER CURIAM:

Both of the following dispositions command support of a majority of the court. For the reasons assigned in these alternate resolutions, the decision of the district court on the motion to suppress is reversed and the matter is remanded.

## PART I

POLITZ, Circuit Judge: [**]

In November, 1977, Jo Ann Williams was indicted in the Northern District of Georgia on two counts of possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1).[1] Before jeopardy attached, the district court granted her motion to suppress evidence of all heroin that had been seized from her. On appeal by the government pursuant to 18 U.S.C. § 3731, the panel majority affirmed, 594 F.2d 86 (5th Cir.). We directed rehearing en banc on our own motion, 594 F.2d 98 (5th Cir.). We now reverse and remand.

## The History

In June, 1976, Special Agent Paul J. Markonni of the Drug Enforcement Administration (DEA) arrested Williams in Toledo, Ohio, for possession of heroin in violation of 21 U.S.C. § 841(a)(1). In March, 1977, after the District Court for the Northern District of Ohio denied her motion to suppress evidence of the heroin, she pleaded guilty and was sentenced to three years imprisonment. She then appealed the denial of her motion to suppress to the Sixth Circuit.[2] The district court ordered Williams released pending appeal.[3] A condition of the order releasing her was that she remain in Ohio.[4]

---

[*] Judge Goldberg was a member of the en banc court under 28 U.S.C.A. § 46(c) and participated in the oral argument of the case en banc. Since that time he has taken senior status and therefore does not participate in this decision.

[**] Concurred in by Chief Judge Coleman and Judges Godbold, Roney, Tjoflat, Rubin, Kravitch, Frank M. Johnson, Jr., Garza, Henderson, Reavley, Hatchett, Anderson, Randall, Tate and Thomas A. Clark.

1. 21 U.S.C. § 841(a)(1) provides:
 (a) Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . .
 Heroin is a Schedule I controlled substance. 21 U.S.C. § 812(c).

2. The Sixth Circuit affirmed the district court, 573 F.2d 1312 (6th Cir. 1977).

3. Release on bond pending appeal is authorized by 18 U.S.C. § 3148, which provides in pertinent part:
 A person . . . (2) who has been convicted of an offense and . . . has filed an appeal . . . shall be treated in accordance with the provisions of section 3146 unless the court or judge has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community.

4. The imposition of travel restrictions as a condition of release, including release pending appeal under § 3148, is provided for by § 3146(a)(2):
 (a) Any person charged with an offense, other than an offense punishable by death, shall, at his appearance before a judicial officer, be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond in an amount specified by the judicial officer, unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required. When such a determination is made, the judicial officer shall, either in lieu of or in addition to the above methods of release, impose the first of the following conditions of release which will reasonably assure the appearance of the person for trial or, if no single condition gives that assurance, any combination of the following conditions:
 * * * * * *
 (2) place restrictions on the travel, association, or place of abode of the person during the period of release . . . .

During the evening of September 28, 1977, Markonni, on assignment at the Atlanta International Airport, recognized Williams as she departed a nonstop flight from Los Angeles. He was aware of the court order requiring that she remain in Ohio.[5] He approached her, identified himself and asked her for identification. Williams produced the same Michigan driver's license she had shown Markonni when he arrested her the prior year in Ohio. She also produced an airline ticket that showed she was about to depart for Lexington, Kentucky.[6] Markonni asked whether she had permission to travel outside Ohio. Williams said, "No, this is the first time." When asked why she was going to Lexington, she said, "I live there now."

Markonni arrested Williams for violating the travel restriction of her release order and took her to the airport police office.[7] A

search of her person made incident to the arrest uncovered a packet of heroin in her coat pocket. Markonni then arrested Williams for violation of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

Markonni took the baggage claim checks from Williams' ticket envelope and retrieved two pieces of luggage she had checked from Los Angeles to Lexington. After Williams refused to consent to a search of the bags Markonni secured them in the airport police office. The following morning Markonni requested a search warrant from a federal magistrate. The Affidavit for Search Warrant that Markonni executed described the luggage and stated that he had reason to believe it contained heroin. He detailed the basis for this belief by giving a sketch of the prior history and the incident at the Atlanta airport.[8] The

---

5. An Assistant United States Attorney for the Northern District of Ohio had informed Markonni of the travel restrictions.

6. The Supreme Court approved a stop and inquiry of this type in *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

7. There are many references in the briefs and in the panel opinion to Markonni's arrest of Williams for "bail jumping." The testimony at the suppression hearing and the affidavit for the search warrant at footnote 8, *infra*, shows that Markonni repeatedly said he arrested Williams for violating the travel restrictions of her release pending appeal. The term "bail jumping" was introduced on cross-examination by Williams' counsel.

8. The text of the affidavit presented to the magistrate setting out the facts tending to establish grounds for issuance of the search warrant was as follows:

On 6–19–76 affiant arrested JoAnn WILLIAMS at Toledo, Ohio, and found and seized 372.82 grams net weight of heroin and 29.51 grams net weight of cocaine in her handbag which was in her possession. WILLIAMS was with Clarence WEBB, her common-law husband who is a reputed narcotic trafficker, and both WILLIAMS and WEBB are reputed couriers for a large scale narcotic distribution organization in the Cincinnati, Ohio area. Subsequent to his arrest with WILLIAMS, WEBB admitted to affiant that the heroin and cocaine were furnished to him by Mico Rachelle ROGERS, a reputed narcotic dealer from Los Angeles, CA who had been arrested

on a date previous to 6–19–76 at Detroit Metropolitan Airport in possession of a large amount of heroin.

On 3–4–77 WILLIAMS and WEBB were convicted by plea of guilty to violation of Title 21, U.S.C. § 841(a)(1), possession with intent to distribute heroin and on 5–6–77 WILLIAMS was sentenced in U.S. District Court, Toledo, Ohio, to the custody of the Attorney General for a period of three years. WILLIAMS appealed her conviction and is on an appeal bond from the Northern District of Ohio.

On 9–28–77, at approximately 7:20 P.M., affiant observed WILLIAMS deplane from Nonstop Delta Airlines flight 1020 from Los Angeles, California, the source city of heroin related to her conviction. Affiant, aware of the above facts and circumstances, interviewed WILLIAMS, during which affiant observed that her airline ticket was for travel from Los Angeles to Lexington, Kentucky, via Atlanta. Affiant knew that all three of the above cities were outside of the area to which WILLIAMS was restricted by her appeal bond. Affiant asked WILLIAMS if she had court permission to leave her area of restriction to which she responded, "no—this is the first time." Affiant asked WILLIAMS why she was traveling to Lexington, Kentucky, to which she responded, "I'm living there now."

Affiant subsequently arrested WILLIAMS and during a search incident to her arrest a quantity of suspected heroin was seized from her jacket pocket. The suspected heroin, found by a female officer, was released to the affiant who observed a field test of the sub-

magistrate issued the warrant and the resultant search revealed a large quantity of heroin.

## The Motion To Suppress

The November, 1977, indictment contained two counts, one based on the heroin found on Williams' person and the other based on the heroin found in her luggage. She moved to suppress all evidence of the heroin. She contended that her arrest upon deplaning was unlawful, therefore evidence of the heroin seized from her person during the search made incident to that arrest should be suppressed. She also contended the search warrant was invalid because its issuance was based in critical part on the information about the heroin found on her person. Accordingly, she argued, evidence of the heroin found in the luggage should be suppressed.

A magistrate heard the motion and concluded the arrest was lawful, the search incident to the arrest was proper, the search warrant appropriately issued and the luggage search was legal. The district court rejected the magistrate's recommendations and sustained the motion, suppressing all evidence of the heroin. The panel majority affirmed.

## Arrest Powers

Williams grounds her argument that her arrest was invalid on 21 U.S.C. § 878(3), which describes the power of DEA agents to make warrantless arrests as follows:

Any officer or employee of the Drug Enforcement Administration designated by the Attorney General may—

\* \* \* \* \* \*

(3) make arrests without warrant (A) for any offense against the United States committed in his presence, or (B) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony . .

■ The government's brief to the panel advanced two theories in support of its argument that the challenged arrest was authorized by this statute. The first was that Markonni had probable cause to make a warrantless arrest for bail jumping under 18 U.S.C. § 3150.[9] The government did not pursue this argument before the en banc court. Like the panel, we reject it.

The government's second theory is that Williams' violation of the conditions of her bond is an offense proscribed by 18 U.S.C. § 401(3) [10] or by 18 U.S.C. § 3146,[11] or by

---

stance conducted by Special Agent Michael L. Dorsett. A positive reaction for the presence of an opiate was observed.

Using luggage claim check numbers obtained from WILLIAMS' ticket envelope, affiant obtained the above-described pieces of luggage. WILLIAMS was asked by affiant to consent to a search of the above-described pieces of luggage, and after telephonically consulting with her attorney, she refused to consent to that search.

**9.** 18 U.S.C. § 3150 is the only section of the Bail Reform Act of 1966 (18 U.S.C. §§ 3146 *et seq.*) containing express criminal penalties. It provides that a willful failure to appear as ordered by the court subjects the person to forfeiture of the appearance bond and other sanctions, including a fine or imprisonment or both. If Williams had been ordered to appear before the court or a judicial officer and had failed to do so, this would have been a felony violation of § 3150 because she was on release pending appeal. In that situation Markonni would have been authorized to arrest her by 21 U.S.C. § 878(3)(B) if he had probable cause to believe

she had willfully failed to appear. The government does not suggest that Markonni had probable cause on that basis.

**10.** 18 U.S.C. § 401(3) provides:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

\* \* \* \* \*

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

**11.** The subsections of 18 U.S.C. § 3146 relevant to this case are § 3146(a)(2) quoted in footnote 4, *supra*, and § 3146(c) which provides:

(c) A judicial officer authorizing the release of a person under this section shall issue an appropriate order containing a statement of the conditions imposed, if any, shall inform such person of the penalties applicable to violations of the conditions of his release and shall advise him that a warrant for his arrest

both. The government contends that, because this offense was committed in Markonni's presence, § 878(3)(A) authorized the warrantless arrest. The panel rejected this argument.

The panel held: "A *court, not a DEA agent,* is empowered by 18 U.S.C. § 401(3) to punish disobedience or contempt of its order by fine or imprisonment." 594 F.2d at 92. From this premise the panel concluded that "DEA agents, therefore, have no implied arrest power under section 401." 594 F.2d at 93. The panel also held that 18 U.S.C. § 3146 did not empower Markonni to arrest Williams, being of the opinion that a violation of a bond condition is not a criminal violation per se. The panel concluded that a violation of a bond condition imposed under § 3146 "merely sets the judicial machinery in motion and empowers a court, not a DEA agent, to determine whether punitive action is warranted." 594 F.2d at 94.

### The Issue

The issue before us might best be brought into focus by the posing of seriatim inquiries:

1. Is the violation of a travel restriction imposed by the court, when granting a release pending appeal, an act of contempt under 18 U.S.C. § 401(3)?

2. If it is contempt, is it or may it be criminal contempt?

3. If it is criminal contempt, is it an offense against the United States within the intendment of 21 U.S.C. § 878(3)?

4. Finally, if an offense, is it necessary for the court to act before an arrest may be made for this offense?

will be issued immediately upon any such violation.

We further note the specific reference to the court's exercise of its contempt power in 18 U.S.C. § 3151, which provides:

Nothing in this chapter [18 U.S.C. § 3146 *et seq.*] shall interfere with or prevent the exercise by any court of the United States of its power to punish for contempt.

**12.** For purposes of procedures, purposes and sanctions, contempt of court is either civil or criminal. Civil contempt is designed to secure compliance with court orders. Criminal con-

Capsulating the foregoing, the issue before us, then, is: Did agent Markonni legally arrest Williams for breach of the court imposed travel restriction in the absence of any initiating request or direction by the court? The panel majority concluded that Markonni could not effect a valid arrest under these circumstances. We conclude otherwise.

### The Offense—The Winding Road

The journey to our conclusion that the breach of the travel restriction is an offense against the United States for which agent Markonni could arrest Williams required a sorting out and alignment of the history of contempt of court and certain of the pertinent statutory and jurisprudential developments. We shall not attempt an exhaustive discussion of that review but, rather, refer to the authorities cited *infra.*

■ Our journey begins with the threshold recognition that the willful breach of a court order imposing a condition of release pending appeal constitutes a contempt of court. Universally and historically, and by the very words of 18 U.S.C. § 401(3), disobedience or resistance to a court's lawful order is contempt of court.[12]

### Contempt—A Crime

■ Contempt has been viewed since time immemorial as a crime. Blackstone unqualifiedly and repeatedly referred to contempt as a crime, as indeed it had been traditionally regarded and punished at common law. 4 *Blackstone's Commentaries,* 1–6, 119–126, 280–287.

tempt seeks to punish a willful violation of court orders. *United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). We do not now address the question whether civil contempt may be a crime. Our present inquiry is confined to a consideration of criminal contempt. The violation of the travel limitation fits into the criminal contempt mold. On a charge of contempt for breach of the travel restriction the court would be acting to punish a past infraction and not to compel future compliance.

The Supreme Court has long recognized that contempt is a crime.[13] The exact positioning of contempt in the panoply of the criminal law, as earlier alluded to, has been the subject of much confusion, inquiry and dispute. However, one beacon light shines throughout: criminal contempt is and always has been considered a crime. Mr. Justice Holmes declared in *Gompers v. United States*, 233 U.S. 604, 610, 34 S.Ct. 693, 695, 58 L.Ed. 1115 (1914):

> These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech.

In the celebrated case of *Green v. United States*, 356 U.S. 165, 201, 78 S.Ct. 632, 652, 2 L.Ed.2d 672 (1958), Mr. Justice Black (in dissent) echoed the foregoing observation by Mr. Justice Holmes and added:

> As it may now be punished criminal contempt is manifestly a crime by every relevant test of reason or history. It was always a crime at common law punishable as such in the regular course of the criminal law.

In a very scholarly fashion Mr. Justice White traced the torturous history of contempt and the constitutional evolution of the disposition of such charges in *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). He concluded the statement quoted below by declaring that "criminal contempt is a crime in every fundamental respect" (391 U.S. at 201, 88 S.Ct. at 1481–82):

Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both.

\* \* \* \* \* \*

Criminally contemptuous conduct may violate other provisions of the criminal law; but even when this is not the case convictions for criminal contempt are indistinguishable from ordinary criminal convictions, for their impact on the individual defendant is the same. Indeed, the role of criminal contempt and that of many ordinary criminal laws seem identical—protection of the institutions of our government and enforcement of their mandates.

One of the principal factors setting contempt apart from other crimes, as one reacts to and attempts to analyze the matter, is that the court may initiate the process leading to punishment. In other instances in the criminal justice area the prosecutor is the initiator. Does the fact that the court may initiate proceedings preclude action by the prosecutor? Does the fact that the court may initiate proceedings substantively affect the question before us?

*Action By The Court—By The Prosecutor*

██ Because of the nature of the offense, and particularly because of the involvement of the court, criminal contempt has been accorded treatment different from other criminal conduct. For example, Rule 42 of the Federal Rules of Criminal Procedure specifically addresses the disposition of criminal contempt, both on a summary basis and upon notice and hearing.[14] However,

**13.** A representative sampling of vintage cases recognizing contempt as a crime includes: *New Orleans v. The Steamship Co.*, 20 Wall. 387, 392, 22 L.Ed. 354 (1874) ("contempt of court is a specific criminal offence"); *O'Neal v. United States*, 190 U.S. 36, 38, 23 S.Ct. 776, 777, 47 L.Ed. 945 (1903) (a judgment for contempt is "in effect a judgment in a criminal case"); *Bessette v. W. B. Conkey Co.*, 194 U.S. 324, 336, 24 S.Ct. 665, 670, 48 L.Ed. 997 (1904) (criminal contempt proceedings "are criminal in their nature"); *Michaelson v. United States ex rel. Chicago, St. P., M. & O. R. Co.*, 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924) (the funda-

mental characteristics of crimes and criminal contempts are the same).

**14.** Rule 42. Criminal Contempt

(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) Disposition upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prose-

this Rule does not purport to vest exclusive authority to initiate contempt charges in the courts. It is merely procedural. The Supreme Court recognized this in *Bloom, supra,* 391 U.S. at 205, 88 S.Ct. at 1484, when it noted that Rule 42 sets forth "many of the procedural protections available to criminal contemnors."

The prosecutor has authority to act in these matters. Criminal contempt charges may be initiated by indictment. *United States v. Leyva,* 513 F.2d 774 (5th Cir. 1975); *Steinert v. United States District Court for the District of Nevada,* 543 F.2d 69 (9th Cir. 1976); *United States v. Avery,* 447 F.2d 978 (4th Cir. 1971); *United States v. Mensik,* 440 F.2d 1232 (4th Cir. 1971). In these cases the indictments were for violations of 18 U.S.C. § 401(3). The prosecutions were commenced without any prior or precipitating action by the court.

The final inquiry is whether criminal contempt *requires* priming or initiating action by the court before a prosecutor or law enforcement officer may act upon the offense. We agree with the Second Circuit's conclusion that no action by the court is necessary before an indictment for criminal contempt may be handed up, *United States v. Morales,* 566 F.2d 402, 404 (2nd Cir. 1977):

> Morales' contention that criminal contempt may not be prosecuted by indictment unless a judge first refers the matter of the alleged act of contempt to the grand jury lacks merit. Many cases have tacitly or explicitly recognized the power of grand juries to hand down indictments charging criminal contempt. E. g., *United States v. DeSimone,* 267 F.2d 741, 743–44 (2d Cir.), *vacated as moot,* 361 U.S. [827], 80 S.Ct. 74, 4 L.Ed.2d 70 (1959)

(grand jury presentment); *Steinert v. United States District Court,* 543 F.2d 69, 70–71 (9th Cir. 1976); *United States v. Mensik,* 440 F.2d 1232 (4th Cir. 1971) (per curiam); *United States v. Sternman,* 415 F.2d 1165 (6th Cir. 1969), *cert. denied,* 397 U.S. 907, 90 S.Ct. 903, 25 L.Ed.2d 88 (1970); *United States v. Eichhorst,* 544 F.2d 1383 (7th Cir. 1976); *United States v. Bukowski,* 435 F.2d 1094, 1103 (7th Cir. 1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971).

Further support for the proposition that contempt is an offense dehors any initiating action by the court is found in the holding and rationale of *Pendergast v. United States,* 317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368 (1943). The Supreme Court there held that a prosecution for contempt was barred by the statute of limitations prohibiting the commencement of prosecutions more than three years after the commission of "any offense." The defendants in *Pendergast* perpetrated a fraud on the court, punishable as criminal contempt, during a period ending in February, 1936. The court subsequently learned of the fraud and in May, 1940, referred the matter to the prosecutor for the filing of charges. Pertinent to our instant inquiry is the court's holding that the period of limitations began to run when the acts occurred and not when the court later initiated action. The offense had occurred at the time of the contumacious act. Were it mandatory that a court act before the prosecutor could proceed, it is entirely conceivable, under *Pendergast,* that the statute of limitations could fully accrue before the contemnor is subject to charge and arrest. We lend no support to that anomaly.

cuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The de-

fendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

The panel noted a decision by the Fourth Circuit that it found of little aid, *United States v. Avery*, 447 F.2d 978 (4th Cir. 1971) (per curiam), *cert. denied*, 405 U.S. 930, 92 S.Ct. 984, 30 L.Ed.2d 804 (1972). In *Avery* the defendant was indicted under 18 U.S.C. § 401 for unauthorized travel outside the bond restricted area. Avery had been ordered to remain in the Eastern District of Virginia but traveled to Jamaica. He was arrested upon returning to Miami. There was no prior action by the court. His conviction was confirmed by the Fourth Circuit and certiorari was denied. We find this case factually and legally indistinguishable and of precedential value.

■ We agree with the panel that 18 U.S.C. § 401(3) gives power only to courts, not DEA agents, to *punish* contumacious acts. We also agree that violations of bond conditions are *punishable* only by the courts. We further agree that 18 U.S.C. § 3150 imposes criminal sanctions only on willful failures to appear. However, 18 U.S.C. § 401(3) provides punishment for the violation of *any* lawful court order, including orders entered pursuant to 18 U.S.C. § 3146(a)(2) restricting travel. We therefore disagree with the panel's conclusion that a DEA agent does not have statutory authority under 21 U.S.C. § 878(3) to make a warrantless arrest for a violation of 18 U.S.C. § 401(3) committed in his presence.

■ We conclude that the willful breach of an order of court restricting travel, entered as a condition of release pending appeal, constitutes criminal contempt under 18 U.S.C. § 401(3). Such a violation is an "offense against the United States" as that term is used in 21 U.S.C. § 878(3). When agent Markonni, possessed of the knowledge that Williams was prohibited from traveling outside of Ohio, saw Williams deplane in Atlanta from a nonstop flight from Los Angeles, an offense against the United States was committed in his presence. Upon confirmation of Williams' identity, agent Markonni was fully empowered to make a valid arrest by 21 U.S.C. § 878(3).

## Miranda

■ The panel raised *sua sponte* the question whether Williams' statements to Markonni should have been suppressed for Markonni's failure to give the warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See footnote 12, 594 F.2d at 92. *Miranda* is not applicable to this factual situation. Other than confirmation of Williams' identity, no information elicited in the questioning of Williams was material to the determination that an offense against the United States was being committed in Markonni's presence. It was only necessary that Markonni know of the existence of the travel restrictions and see Williams in Atlanta to perceive the offense and act properly thereon. The questions about permission to travel and destination could only elicit neutral or exculpatory responses. Williams might have said and have been able to show that she had permission to travel. That answer would have negated what otherwise was an apparent criminal act. The questions and answers did not change the basic factual situation, *i. e.*, the observation of Williams traveling outside of Ohio by a law enforcement official who was aware of a court order requiring that she stay in Ohio.

■ We find that the arrest by agent Markonni was legal, the search of Williams' person incidental to that arrest was proper and the heroin found in her coat pocket was lawfully seized. We further find that the search warrant was issued on the requisite showing and the heroin discovered in the luggage was the product of a lawful search and seizure.

Having reached the foregoing conclusion it becomes unnecessary for us to consider the applicability *vel non* of the exclusionary rule and we express no opinion with respect thereto. The granting of this rehearing en banc vacated the panel opinion (5th Cir.R. 17).

The decision of the district court granting the motion to suppress is REVERSED and this cause is REMANDED for further proceedings.

## PART II

GEE and VANCE, Circuit Judges: ***

Many of the thirteen judges who join in this opinion do not disagree with that prepared by Judge Politz for a different majority of the court; several formally concur in it. It is our view, however, that the drugs suppressed as evidence by the trial judge and by our panel should not have been and that to suppress them was wrong whether or not Williams' violation of a bond condition was such a crime as warranted her arrest and the consequent search of her person that revealed their presence.

The facts material to our view of this case are so simply stated that we reiterate them for the reader's convenience.[1] Special Agent Markonni, of the Drug Enforcement Administration, had previously arrested defendant Jo Ann Williams for running drugs. Pending her appeal from conviction of that offense, he knew that she was free on bond conditioned that she remain within the State of Ohio. While on duty at the Atlanta airport, he saw her deplane from an incoming, nonstop flight from Los Angeles. As she proceeded toward the departure gate for a flight to Kentucky on which she held a ticket, he arrested her for "bail jumping." A search pursuant to that arrest revealed that she was again running heroin.

Indicted for this second drug offense, committed while free on bail from the first, Williams moved to suppress the fruits of the search conducted pursuant to Markonni's arrest. The district court suppressed this evidence. On appeal from its ruling, a panel of our court affirmed. It reasoned that since violation of a bond condition was not a criminal offense such that a warrantless arrest could be made for it, both the arrest and the search pursuant to it were invalid. It therefore suppressed the heroin found as "fruit of the poisonous tree."

In the panel's view, Agent Markonni's reasonable belief, held in an unquestioned good faith, that he was authorized to arrest Williams cut no figure in the analysis. Judge Charles Clark, dissenting, would have refused to apply the exclusionary rule in such circumstances. We took the case en banc to decide this question.

■ Sitting en banc, we now hold that evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized. We do so because the exclusionary rule exists to deter willful or flagrant actions by police, not reasonable, good-faith ones. Where the reason for the rule ceases, its application must cease also. The costs to society of applying the rule beyond the purposes it exists to serve are simply too high—in this instance the release on the public of a recidivist drug smuggler—with few or no offsetting benefits. We are persuaded that both reason and authority support this conclusion.

### The "Good-Faith Exception"

Analytically, it matters little whether reasonable, good-faith police actions be viewed simply as beyond the reach of the rule or as constituting an exception to its application. Since numerous writers and judges have employed the latter formulation, we shall do so here. One commentator defines the "exception" as follows: "when an officer acts in the good faith belief that his conduct is constitutional and where he has a reasonable basis for that belief, the exclusionary rule will not operate." Ball, *Good Faith and the Fourth Amendment: The "Reasonable" Exception to the Exclusionary Rule*, 69 J.Crim.L. & Criminology 635, 635 (1978).

In fourth amendment cases, most good faith violations concern the failure to

---

*** Concurred in by Chief Judge Coleman and Judges Brown, Ainsworth, Charles Clark, Roney, Tjoflat, Hill, Fay, Garza, Reavley, and Sam D. Johnson.

1. Judge Politz' foregoing opinion, or that of the panel, 594 F.2d 86 (5th Cir. 1979), may be consulted for a more detailed account. No warrant is involved here, hence nothing that we say applies to factual situations where one has been obtained.

meet the requirement of probable cause. Two basic types of violation are possible. First, an officer may make a judgmental error concerning the existence of facts sufficient to constitute probable cause. Such cases may be characterized as examples of *"good faith mistake."* Second, an officer may rely upon a statute which is later ruled unconstitutional, a warrant which is later invalidated, or a court precedent which is later overruled. In each of these cases, the officer may be deemed to have committed a *"technical violation."*

*Id.* at 638–39 (emphasis added and footnotes omitted). The Supreme Court and this circuit have all but explicitly adopted the technical-violation facet of the good-faith exception, and each has rendered several decisions that implicitly, at least, support the good-faith mistake facet; we discuss these opinions in detail below. Many writers have advocated the exception, among them Professor Charles Alan Wright, no minor authority on criminal procedure, who proposes modifying the rule so that "the criminal is to go free if the constable has flouted the fourth amendment but not if he has made an honest blunder."[2] Judge Henry Friendly has suggested limiting suppression to "the fruit of activity intentionally or flagrantly illegal."[3]

At least "four current members of the United States Supreme Court have urged the adoption of a good faith exception to the exclusionary rule." Ball, *supra* at 635. *E. g., Stone v. Powell*, 428 U.S. 465, 538, 96 S.Ct. 3037, 3073, 49 L.Ed.2d 1067 (1976)

(White, J., dissenting);[4] *Brown v. Illinois*, 422 U.S. 590, 610–12, 95 S.Ct. 2254, 2265–66, 45 L.Ed.2d 416 (1975) (Powell, J., concurring). The Supreme Court itself, in a long series of recent decisions, has restricted the application of the rule so that it is not now—if it ever was—coextensive with the fourth amendment. *E. g., Michigan v. De-Fillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Stone v. Powell, supra; United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). We think that reason plainly demands explicit recognition of a reasonable good-faith exception as well.[4a]

*Justification for the Good-Faith Exception*

 The exclusionary rule, it is now well settled, is not itself a requirement of the Constitution. *E. g., Stone v. Powell, supra*, 428 U.S. at 482, 96 S.Ct. at 3046; *United States v. Calandra, supra* 414 U.S. at 348, 94 S.Ct. at 620. Rather, it is a judge-made rule crafted to enforce constitutional requirements, justified in the illegal search context only by its deterrence of

---

2. C. Wright, *Must the Criminal Go Free if the Constable Blunders?*, 50 Tex.L.Rev. 736, 740 (1972).

3. H. Friendly, *Benchmarks*, 260–62 (1967).

4. Justice White stated:

[T]he rule should be substantially modified so as to prevent its application in those many circumstances where the evidence at issue was seized by an officer acting in the *good-faith belief* that his conduct comported with existing law and *having reasonable grounds for this belief*. These are recurring situations; and recurringly evidence is excluded without any realistic expectation that its exclusion will contribute in the slightest to the

purposes of the rule, even though the trial will be seriously affected or the indictment dismissed. (Emphasis added.)

4a. We emphasize that the belief, in addition to being held in subjective good faith, must be grounded in an objective reasonableness. It must therefore be based upon articulable premises sufficient to cause a reasonable, and reasonably trained, officer to believe that he was acting lawfully. Thus, a series of broadcast breakins and searches carried out by a constable—no matter how pure in heart—who had never heard of the fourth amendment could never qualify.

future police misconduct.[5] The rule's application, moreover, must be considered in light of its direct effect of preventing the "whole truth" from being told and its by-products of freeing guilty criminals and endangering society.[6] Consequently, the rule is not applied in those contexts where it does not effectively deter official misconduct. *E. g., Stone v. Powell*, 428 U.S. at 486–87, 96 S.Ct. at 3048–49; *United States v. Calandra*, 414 U.S. at 348, 351–52, 94 S.Ct. at 620, 621–22; *United States v. Cruz*, 581 F.2d 535, 538 n.1 (5th Cir. 1978) (en banc). Such a context is that of technically improper police actions taken in a reasonable good faith, as is persuasively argued by Judge Clark in his dissent to the panel opinion:

> No proper deterrent effect is accomplished by the suppression of the evidence in this case. Field officers are seldom trained as legal technicians. Even those who are may have mistakenly thought that Officer Markonni's arrest was proper. Since the officer whose future actions are to be affected will not realize his actions are wrongful when he is compelled to make a quick decision in an apparently valid arrest situation which complicated legal analysis may later establish to be invalid, we cannot expect him to be deterred. If today's ruling does serve as any sort of deterrent, it may have the deleterious effect of making the officer on the line overcautious to act in a situation where proper and reasonable instinct tells him that the activity he observes is criminal. If he hesitates to act lest he later be criticized for denying to the process of justice evidence of crime, we have hindered, not furthered, the interests of justice. Unless an officer knows or should know his activities transgress the bounds of law, the evidence discovered by such activity ought not be suppressed.

*United States v. Williams*, 594 F.2d 86, 97–98 (5th Cir. 1979). It makes no sense to speak of deterring police officers who acted in the good-faith belief that their conduct was *legal* by suppressing evidence derived from such actions unless we somehow wish to deter them from acting at all. The Supreme Court recognized this in *Janis* in admitting evidence obtained in good faith under a warrant later found defective. "[T]he officers here were clearly acting in good faith, . . . a factor that the Court has recognized reduces significantly the potential deterrent effect of exclusion. See *Michigan v. Tucker*, 417 U.S., at 447 [94 S.Ct., at 2365]; *United States v. Peltier*, 422 U.S., at 539 [95 S.Ct., at 2318]." 428 U.S., at 459 n.35, 96 S.Ct., at 3034 n.35. Justice White as well has noted this lack of any deterrent effect:

> When law enforcement personnel have acted mistakenly, but in good faith and on reasonable grounds, and yet the evidence they have seized is later excluded, the exclusion can have no deterrent effect. The officers, if they do their duty, will act in similar fashion in similar circumstances in the future; and the only consequence of the rule as presently administered is that unimpeachable and probative evidence is kept from the trier of fact and the truth-finding function of proceedings is substantially impaired or a trial totally aborted.

*Stone v. Powell*, 428 U.S. at 540, 96 S.Ct. at 3073–74 (White, J., dissenting). And again, Professor Wright has pithily observed that a "police officer will not be deterred from an illegal search if he does not know that it is illegal." Wright, *supra* at 740.

Any slight deterrent effect of excluding fruits of good-faith arrests is even less than the small deterrence from suppressing the fruits of illegal police actions that are attenuated in effect, that are challenged in habeas corpus petitions on fourth amendment grounds, that are used in grand jury

---

5. *E. g., Michigan v. DeFillippo*, 99 S.Ct. at 2633 n.3; *United States v. Cruz*, 581 F.2d 535, 538 n.1 (5th Cir. 1978) (en banc).

6. *E. g., Stone v. Powell*, 428 U.S. at 489–91, 96 S.Ct. at 3050–51; *Irvine v. California*, 347 U.S. 128, 136, 74 S.Ct. 381, 385, 98 L.Ed. 561 (1954), and especially *United States v. Lamas*, 608 F.2d 547, 550 (5th Cir. 1979).

deliberations, or that are used for impeachment. Yet the Supreme Court has found that the deterrent effect of exclusion in the examples listed and others does not justify the societal harm incurred by suppressing relevant and incriminating evidence. *United States v. Ceccolini*, 435 U.S. 368, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Stone v. Powell, supra*; *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The good-faith exception that we explicitly recognize today is of a kind with these.

### Support in Authority for the Technical Violation Facet of the Good-Faith Exception

■ The most common forms of "technical violations" made in good faith are arrests made in good-faith reliance on a statute that is later declared unconstitutional or, as here, on a reasonable interpretation of a statute that is later construed differently. Of course, the exception applies only if the police belief is *both* bona fide *and* reasonable. Suppression still results if officers allege a good-faith belief in a "law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws" or in a law that violated a "controlling precedent that [it] was . . . unconstitutional." *Michigan v. DeFillippo*, 443 U.S. at 38, 99 S.Ct. at 2632.

In *DeFillippo* the Supreme Court admitted evidence seized in a good-faith arrest with probable cause (without a warrant) for violation of a law later declared unconstitutional. An officer arrested DeFillippo in good-faith reliance on such an ordinance, finding drugs in a search of DeFillippo's person made incident to the arrest. The Court ruled, in words that seem applicable to Officer Markonni's search of Williams' person and luggage:

[T]here was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance. A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.

*Id.* 99 S.Ct. at 2632. This decision was rendered after the instant panel decision, so the panel did not have the benefit of the Supreme Court's disposition of this closely analogous fact situation.

In *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), the Supreme Court admitted evidence seized in a good-faith border search without a warrant under a statutory construction that was subsequently held unconstitutional. Border patrol agents made a warrantless search of Peltier's automobile, in reliance on a longstanding administrative definition, continuously approved judicially, of a reasonable distance from the border for such searches as 100 miles; and Peltier was convicted on evidence seized during that border search. The Supreme Court later overturned that definition of a reasonable distance. The Court refused to exclude the challenged evidence and refused to apply that subsequent decision retroactively: "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* at 542, 95 S.Ct. at 2320.

In *United States v. Carden*, 529 F.2d 443 (5th Cir. 1976),[7] we sustained an arrest and search made in good faith under a statute later declared invalid. The Cardens were arrested and searched under an ordinance

---

7. *Cert. denied*, 429 U.S. 848, 97 S.Ct. 134, 50 L.Ed.2d 121 (1976), *modified on other grounds sub nom. United States v. Ashley*, 569 F.2d 975, 979 (5th Cir.), *cert. denied*, 439 U.S. 853, 99 S.Ct. 163, 58 L.Ed.2d 159 (1978).

against loitering, and a large bag of coins found in the search was used to convict them of robbing a government building. The ordinance was subsequently found unconstitutional, but the evidence derived from the good-faith search was not excluded.

> This Court has held more than once that an arrest made in good faith reliance on a statute not yet declared unconstitutional is valid regardless of the actual constitutionality of the ordinance. *Hamrick v. Wainwright,* 465 F.2d 940 (5 Cir. 1972); *United States v. Kilgen,* 445 F.2d 287 (5 Cir. 1971). *See also . . . Moffett v. Wainwright,* 512 F.2d 496, 502 n.6 (5 Cir. 1975). While appellants would be entitled to attack the constitutionality of any convictions under the Anniston ordinance, "there is no bar to the use of evidence of other crimes obtained during incarceration for violation of a law which was valid when the arrest was made." 465 F.2d at 941–42.

> . . . [W]e have been reluctant to, and will not in this case, also require that [police officers] forecast future judicial decisions as to the constitutionality of the statutes under which they must make arrests. There is no evidence whatsoever in the record that the arresting officers did not believe that the Anniston loitering ordinance was constitutionally valid. No judicial decision existed, or now exists so far as we know, to negate that conclusion. Under such circumstances, we must reject the Cardens' attempt to assert the unconstitutionality of the ordinance to invalidate their arrest.

*Id.* at 445.

In *United States v. Kilgen,* 445 F.2d 287 (5th Cir. 1971), this circuit admitted evidence obtained in good faith under a similar statute. Kilgen was arrested and charged in good faith with violation of a vagrancy ordinance, and he consented to the officer's opening an automobile trunk where the officer saw numerous postage stamps and money orders. Kilgen confessed to the crime of stealing these things. We sustained admission of the confession because the police had arrested Kilgen in good faith,

and hence exclusion would not deter any official misconduct, although the ordinance was later overturned.

> But overturning a [vagrancy] conviction due to an invalid statute does not automatically render the previous arrest and detention illegal absent some showing that police officials lacked a good-faith belief in the validity of the statute. . . . There is no hint of any abusive police conduct in effecting the arrest or in obtaining the evidence used at the trial for another crime. . . . In short, this is a clear case of police officers who, with the utmost regard for the rights of the defendant, carried out their sworn duty to make an arrest and obtain evidence under the law as it then existed. No legitimate interest would be served by excluding the confession to the separate crime of stealing postage stamps because we now find the vagrancy ordinance invalid.

*Id.* at 289. *See also United States v. Warren,* 578 F.2d 1058, 1077 n.17 (5th Cir. 1978) (en banc), *rehearing en banc granted,* 589 F.2d 254 (5th Cir. 1979) ("The validity of an arrest depends upon the reasonableness of the officers' actions at the time of the arrest and not upon what a court may glean from a statute three and a half years later. This rule is well established even where the statute under which the arrest was made is after declared unconstitutional.").

## Support in Authority for the Good-Faith Mistake Facet of the Exclusionary Rule

■ If Officer Markonni was mistaken in his belief that Williams' violation of her bond conditions authorized him to arrest her, as the trial court and our panel both held he was, his mistake was one made in a manifest good faith. Much authority also supports this facet of the exception that, we reiterate, requires a reasonable belief, as well as a good-faith belief, on the part of law enforcement officials.

In *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the Supreme Court refused to exclude from a

federal tax proceeding evidence that had been obtained by state police in good-faith reliance on a search warrant later found defective. State police had seized wagering records and cash from Janis under a search warrant issued on allegations of bookmaking. A state court, finding the officer's affidavit that supported the warrant defective, suppressed that evidence. The Internal Revenue Service assessed Janis for excise taxes on wagering and levied on the seized cash. Janis filed a refund suit in district court and moved to suppress that evidence. The Supreme Court stated the issue and then resolved it as follows: "Is evidence seized by a state criminal law enforcement officer *in good faith*, but nonetheless unconstitutionally, inadmissible in a civil proceeding by or against the United States?" *Id.* at 434, 96 S.Ct. at 3023 (emphasis added).

> [W]e conclude that exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion. This Court, therefore, is not justified in so extending the exclusionary rule.

*Id.* at 454, 96 S.Ct. at 3032 (footnote omitted).

In *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Court declined to exclude the testimony of a witness located as the result of statements made by the accused during police interrogation administered "in complete good faith" but without proper *Miranda* warnings. The police questioned Tucker after his arrest for rape without giving full *Miranda* warning, and he voluntarily gave the alibi that he had been with Henderson. Henderson subsequently testified against Tucker, and Tucker moved to suppress his incriminatory statements on the ground that his identity was obtained in the im-

proper interrogation. The Supreme Court admitted Henderson's testimony.

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

*Id.* at 447, 94 S.Ct. at 2365.[8]

In *United States v. Hill*, 500 F.2d 315, 322 (5th Cir. 1974), *cert. denied*, 420 U.S. 931, 95 S.Ct. 1135, 43 L.Ed.2d 404 (1975), this circuit admitted evidence obtained in a search although the warrant was technically improper. The search warrant was issued upon an insufficient affidavit of a law enforcement agent, and the subsequent search of Hill's residence yielded heroin. We admitted the heroin and affirmed Hill's conviction because we allowed the affidavit to be bolstered by the sworn testimony of the agent before the magistrate.

> [T]his situation furnishes no occasion to apply the exclusionary rule to bar the evidence of Hill's criminality that was obtained in executing the warrant. Phillips acted properly in going to the magistrate and seeking a warrant. Magistrate Sear acted properly in calling for additional information to demonstrate credibility. Thus, the only error attributable to the procedure they followed is a technical one that would in no way serve the deterrent purposes of the rule.

*Id.* at 322 (alternative ground).

In *United States v. Wolffs*, 594 F.2d 77 (5th Cir. 1979), we refused to exclude evidence obtained through improper collabora-

---

8. Although the accused in *Tucker* had been questioned before *Miranda*, that does not distinguish the instant case, because *Miranda* has been held retroactive. *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). *See Michigan v. Tucker*, 417 U.S. at 447-48, 94 S.Ct. at 2365.

tion of federal and state agents. Pugh, a member of the United States Army, arranged a marijuana purchase from Wolffs at the suggestion of a county sheriff. An Army investigator and some sheriff's office personnel arrested Wolffs and his accomplices and seized the marijuana, thus violating the Posse Comitatus Act, 18 U.S.C. § 1385. The panel, recognizing the agents' good faith in that this was an isolated act, refused to apply the exclusionary rule.

> [A]ssuming without deciding that there was a violation, application of an exclusionary rule is not warranted. If this Court should be confronted in the future with widespread and repeated violations of the Posse Comitatus Act an exclusionary rule can be fashioned at that time.

594 F.2d at 85. *See also Leary v. United States*, 544 F.2d 1266, 1270–71 (5th Cir. 1977).

The recent decision of the Supreme Court in *Ybarra v. Illinois*, 444 U.S. 85, 96, n.11, 100 S.Ct. 338, 345 n.11, 62 L.Ed.2d 238 (1979), does not militate against the good-faith exception. The Court there held that a search of Ybarra and other patrons of a bar violated the fourth amendment because it was not authorized by a warrant to search the bartender and was not justified by probable cause to believe that Ybarra possessed heroin or a reasonable belief to anticipate that he was armed. Exclusion of evidence seized without any probable cause is an entirely different question from suppression of evidence seized upon a good-faith and reasonable belief in the existence of probable cause. The Supreme Court in *DeFillippo, supra*, while refusing to exclude evidence seized in good-faith reliance on a subsequently invalidated statute, noted that "the exclusionary rule requires suppression of evidence obtained in searches carried out pursuant to statutes . . . which purported to authorize the searches in question without probable cause." 99 S.Ct. at 2633. And the Court in *Ybarra* distinguished *DeFillippo* on precisely this basis when it em-

phasized that the "statute purports instead to authorize the police in some circumstances to make searches and seizures without probable cause." 444 U.S. 96 n.11, 100 S.Ct. 345 n.11.

### Application of the Good-Faith Exception to This Case

██ Officer Markonni recognized with certainty that Williams was in violation of her bail limitations and that she was arriving from the very city from which she had obtained the heroin that caused her first conviction, rendered on a guilty plea. He acted in a good-faith belief that Williams' conduct violated 18 U.S.C. § 3146. This circuit at the time of the arrest had not ruled that a person violating bail requirements, but not a court appearance date, could or could not be arrested on that basis, and the only circuit that had inferentially done so had sustained the conviction.[9] Officer Markonni also acted under a reasonable, whether or not mistaken, belief and should not be charged with knowledge that a future panel decision would construe section 3146 to apply only to bond jumping that involved missing a court appearance. This case presents the questions both of a "good-faith mistake," an action under a reasonable factual error about an element of the crime defined in section 3146, and a good-faith "technical violation," an action under a reasonable interpretation of the arrest power under section 3146 that was subsequently reconstrued by our panel. Williams is not on trial for bail jumping. Williams is on trial for possession of a large quantity of heroin. A good-faith mistake about the legal intricacies of bail jumping would not require exclusion of that heroin found in an incidental search.

### Conclusion

██ Henceforth in this circuit, when evidence is sought to be excluded because of police conduct leading to its discovery, it will be open to the proponent of the evi-

---

**9.** *United States v. Avery*, 447 F.2d 978 (4th Cir. 1971), *cert. denied*, 405 U.S. 930, 92 S.Ct. 984, 30 L.Ed.2d 804 (1972).

dence to urge that the conduct in question, if mistaken or unauthorized, was yet taken in a reasonable, good-faith belief that it was proper. If the court so finds, it shall not apply the exclusionary rule to the evidence. Neither Markonni's good faith nor its reasonableness are questioned here, and a proper allocation of the burden of proof on this issue is therefore not squarely presented by the facts of this case. We therefore leave that matter to another day, going no further than to delineate the "exception" itself explicitly and to recognize that where the proponent establishes it, the evidence should be received if otherwise admissible.

Predictably, it will be argued that today's decision undercuts the fourth amendment. Not so; it concerns only the exclusionary rule, one device—but not the sole one—for enforcing the amendment, and a device that is already far from co-extensive with the amendment itself. As for the exclusionary rule, insofar as we restrict its application, we do so only to conform that to its underlying purpose: to deter unreasonable or bad-faith police conduct.

Where the reason for a rule ceases, the rule should also cease—a familiar maxim carrying special force here. For here the cost of applying the rule is one paid in coin minted from the very core of our factfinding process, the cost of holding trials at which the truth is deliberately and knowingly suppressed and witnesses, in contravention of their oaths, are forbidden to tell the whole truth and censured if they do. This is a high price indeed and one that ought never be paid where, in reason, no deterrence is called for and none can in fact be had. Such a continued wooden application of the rule beyond its proper ambit to situations that its purposes cannot serve bids fair to destroy the rule entirely in the long run. For the reasons we have stated, in addition to and independent of those given in Judge Politz' opinion, the decision of the district court excluding Williams' heroin and the panel opinion affirming it are

REVERSED.

JAMES C. HILL, Circuit Judge, with whom, FAY, Circuit Judge, joins, concurring specially:

I concur in the result reached in this case. I write briefly to explain why I agree with the approach proposed by Judges Gee and Vance.

Application of the Exclusionary Rule often requires us to set free the guilty because the constable, in good faith, blundered. In such cases, "[t]he temptation . . . becomes great to round off the edges of the Fourth Amendment to avoid the drastic result which obtains when the Exclusionary Rule is applied." *United States v. Lamas*, 608 F.2d 547, 550 (5th Cir. 1979). The good faith exception articulated by Judges Gee and Vance provides a sensible approach to the problem. It allows us to come to a just result without cutting away at the Fourth Amendment and, at the same time, without removing the deterrent effect of the Exclusionary Rule.

I am intrigued, but not persuaded, by the new approach urged upon us by Judge Rubin. He suggests that because a majority can resolve the issue before us (admissibility of the evidence *vel non*) by deciding the constitutionality of the search, we should not address the admissibility of the evidence on other grounds. I believe the order of address is the other way around. If we find the evidence admissible without regard to the constitutional question, we should decline to reach and decide the latter. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936).

My brother Rubin's scholarly exposition of possible rationales for the exclusionary rule other than deterrence carries with it the implication that, if there be no other reason, the opinion authored by Judges Gee and Vance is correct. While other possible bases have been proffered from time to time, *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 persuades me that they do not survive. Justice Brennan's eloquent dissent, quoted by Judge Rubin (p. 850), reveals that the issue of their

survival was clearly before the court. Were the rule grounded upon the necessity of avoiding "the taint of partnership in official lawlessness," it would exclude *all* evidence obtained in contravention of the Fourth Amendment. However,

> [d]espite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served. The balancing process implicit in this approach is expressed in the contours of the standing requirement. Thus, standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Wong Sun v. United States* [371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441], *supra*; *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search. (414 U.S. at 348, 94 S.Ct. at 620)

The majority in *Calandra* says: "In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect . . . ." *Id.* at 348, 94 S.Ct. at 620. I accept that deterrence is its reason and its goal.

We seek to deter violations of constitutional guarantees, not just to deter action of a law enforcement officer contrary to his or her deficient understanding of the law. This requires that law enforcement personnel acquaint themselves with those guarantees (by being deterred from persistent ig-

norance) and be disposed towards respecting them. This is the reason for making it clear that subjective good faith will not, by itself, suffice. Judge Rubin, in his footnote 4 (p. 850), suggests that the thrust of the opinion by Judges Gee and Vance might just as well reach evidence obtained in subjective good faith alone. That reads the opinion beyond its logic. That would reward ignorance. The rule we announce encourages learning.

ALVIN B. RUBIN, Circuit Judge, with whom GODBOLD, KRAVITCH, FRANK M. JOHNSON, Jr., POLITZ, HATCHETT, ANDERSON, RANDALL, TATE and THOMAS A. CLARK, Circuit Judges, join, specially concurring.

The twenty-four of us are rarely unanimous. However, none of us has expressed any doubt about the validity of the arrest of Jo Ann Williams and the resultant search of her person or the subsequent admissibility of the evidence thus found. Yet many of my brethren have seized the occasion to discuss what they consider an alternative ground for decision, but what is to me purely a hypothetical: whether the evidence would have been admissible had the search been unconstitutional. Judicial self-restraint should command us to defer until another day the discussion of issues that might have been material had the arrest been improper. Only in that event would it be necessary to consider whether evidence unconstitutionally taken must be suppressed. Only in that event would it even be appropriate for us to do so. I submit that those of my brethren who have joined in the separate opinion authored by Judges Gee and Vance and published as Part II, are " 'reach[ing] out' for a vehicle to change a long line of precedent," *Crist v. Cline,* 434 U.S. 980, 981, 98 S.Ct. 603, 604, 54 L.Ed.2d 475 (1977) (Marshall, J., dissenting from order restoring case to calendar for oral argument), and that their doing so will have harmful results apart from the merit or lack of merit of their views.

In his dissent in *Bivens v. Six Unknown Named Agents of Federal Bureau of Nar-*

*cotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), Chief Justice Burger traced the evolution, criticisms and weaknesses of the exclusionary rule.[1] No more complete critique can be desired. Yet, while the Chief Justice of the United States proposed some narrowing of the thrust of the rule, he said:

> I do not propose, however, that we abandon the suppression doctrine until some meaningful alternative can be developed. . . . I see no insuperable obstacle to the elimination of the suppression doctrine if Congress would provide some meaningful and effective remedy against unlawful conduct by government officials.

403 U.S. at 421–22, 91 S.Ct. at 2017, 29 L.Ed.2d 641.[2]

Legislation was at one time introduced to limit the application of the rule and to provide for damage actions against the United States. *See* S. 881, 93rd Cong., 1st Sess., 119 Cong.Rec. 4195 (1973). Further congressional attempts to deal with the issue may be anticipated.

It is needless to catalog the many decisions and the extensive literature in support of the exclusionary rule.[3] My brethren find that four justices of the Supreme Court have written in support of some modification of the rule. However, five members of the Court up to now have not suggested its qualification, and they constitute a majority. No other circuit court has altered the rule. Consideration of these factors should make us hesitate to rush in with our own newly devised judicial solutions. Those who join in the opinion authored by Judges

Gee and Vance can cite no direct precedent for their conclusions save dissents and law review articles, many of which are polemic. They advocate modification of the exclusionary rule solely because, as applied, they think it ineffective to deter police misconduct and because they consider deterrence its exclusive purpose.

Deterrence is an important reason for the rule. However, even the decision in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), did not consider it the only basis of the rule. Justice Day's opinion relies on the duty of the courts to support the Constitution and to refuse to sanction practices destructive of rights secured by it. As the Supreme Court later observed:

> "[T]here is another consideration—the imperative of judicial integrity." The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.

*Mapp v. Ohio,* 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081, 1092 (1961) (citation omitted).

Justice Brennan elaborated on this rationale for the rule in his dissent in *United States v. Calandra,* 414 U.S. 338, 357–58, 94 S.Ct. 613, 624–25, 38 L.Ed.2d 561, 576–77 (1971):

> The exclusionary rule, if not perfect, accomplished the twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the

---

**1.** The Chief Justice stated:

Some clear demonstration of the benefits and effectiveness of the exclusionary rule is required to justify it in view of the high price it extracts from society—the release of countless guilty criminals. See Allen, Federalism and the Fourth Amendment: A Requiem for Wolf, 1961 Sup.Ct.Rev. 1, 33 n. 172. But there is no empirical evidence to support the claim that the rule actually deters illegal conduct of law enforcement officials. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Ch.L.Rev. 665, 667 (1970).

403 U.S. at 416, 91 S.Ct. at 2014, 29 L.Ed.2d at 638.

**2.** In his concurring opinion in *Stone v. Powell,* 428 U.S. 465, 497, 96 S.Ct. 3037, 3053, 49 L.Ed.2d 1067 (1976), the Chief Justice said that the time had come to modify the reach of the rule "even if it is retained for a small and limited category of cases."

**3.** *See, e. g.,* Kamisar, *The Exclusionary Rule in Historical Perspective; The Struggle to Make the Fourth Amendment More Than 'An Empty Blessing,'* 62 Judicature 337 (1979); *cf.* 1 W. LaFave, Search and Seizure § 1.2 (1978).

people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government.

That these considerations, not the rule's possible deterrent effect, were uppermost in the minds of the framers of the rule clearly emerges from the decision which fashioned it:

> "The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law. . . . The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

. . . . .

This protection is equally extended to the action of the government and officers of the law acting under it. . . . To sanction such proceedings would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." *Weeks v. United States*, 232 U.S. 383, 391–392, 394, 34 S.Ct. 341, 344, 345, 58 L.Ed. 652 (1914).

The rule has also been justified, notably by the late Justice Hugo Black, on the basis that the relationship between the fourth amendment and the self-incrimination clause of the fifth amendment requires suppression. *See Mapp v. Ohio*, 367 U.S. 643, 661–666, 81 S.Ct. 1684, 1694–1698, 6 L.Ed.2d 1081, 1093–96 (1961) (concurring opinion). *See also Wolf v. Colorado*, 338 U.S. 25, 41–42, 48, 69 S.Ct. 1359, 1368–69, 93 L.Ed. 1782, 1793 (1949) (Rutledge, J., dissenting).

Whether or not the rule should be modified, these opinions warrant the full and direct consideration they have not received in Part II. The announcement of a radical change in the scope of the exclusionary rule creates a host of interpretative problems.[4] Its application presumably will require re-

---

4. Part II does not make clear the scope of the shield of either good faith or of reasonableness. It raises many questions. For example, does the reasonable-good-faith doctrine permit introduction of evidence taken under an invalid search warrant because the policeman reasonably believed it to be valid? Does it shield only errors of fact or both errors of fact and errors of law?

While I do not consider this a proper occasion for discussion of the merits of the exclusionary rule either in general or as applied to this case, I must point out that the solution advocated by my brethren in Part II raises questions that warrant debate. When we are confronted with a case whose resolution truly turns on the exclusionary rule, I would consider all of the Supreme Court precedents. If they allowed us, as judges of an inferior court, sufficient latitude, I would consider all of the arguments for and against the rule and not merely its potential for deterring police misconduct. On that occasion, I would examine more closely the logic of the remedy proposed in Part II. My brethren reason that the exclusionary rule is

"justified in the illegal search context only by its deterrence of future police misconduct." P. 841 *supra*. They say, "It makes no sense to speak of deterring police officers who acted in the good-faith belief that their conduct was *legal* by suppressing evidence derived from such actions unless we somehow wish to deter them from acting at all. . . . [A] 'police officer will not be deterred from an illegal search if he does not know that it is illegal.'" P. 842 *supra*.

If this is correct, it appears needless to require the police officer's subjective good faith also be objectively reasonable. A policeman who is in complete subjective good faith is unlikely to stop to ask himself, "Am I also reasonable?" The additional criterion that the mistaken belief that the officer is acting correctly must also be reasonable suggests uneasiness with the reliability of a good faith test. It cannot be justified on the unsupported supposition that *if* the police know good faith alone will not suffice, they will also be encouraged to learn constitutional law and deterred from acting in either ignorance or unreasonableness.

trial of almost every motion to suppress in every criminal case now pending before us on appeal and in many cases now pending in district courts. In many trials, motions to suppress will be denied, defendants will be convicted, their convictions will be appealed and there will be no finality until the Supreme Court decides. The announcement of the rule as an alternative ground for decision in a case where all the court agrees on the result virtually immunizes this case from Supreme Court review. We must, therefore, await another case where the issue is directly raised and decide the question again before there can be reasonable hope that the Supreme Court will review what we do. I must, therefore, express my regret that this case has been utilized as a vehicle to disseminate a doctrine unnecessary to its decision. The merit or lack of merit of action that is so gratuitous need not at this time be further discussed.

