**SMITH STEEL CASTING COMPANY, Petitioner,**

v.

**William E. BROCK, Secretary of Labor, Respondent.**

No. 85–4346.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1986.

Robert D. Moran, Vorys, Sater, Seymour & Pease, Washington, D.C., for petitioner.

Sandra Lord, Atty., Daniel J. Mick, Office of the Sol., U.S. Dept. of Labor, Ray H. Darling, Executive Secretary, O.S.H.R.C., Washington, D.C., for respondent.

Before GEE, GARZA, and HIGGINBOTHAM, Circuit Judges.

GEE, Circuit Judge:

■ This is an appeal from an order of the Occupational Safety and Health Review Commission ("OSHRC" or "the Commission"), upholding the ruling of an administrative law judge ("ALJ") against Smith Steel Casting Co., Inc. ("Smith") for failure to comply with OSHA standards codified in 29 C.F.R. §§ 1910.134 and 910.1000 (1980).

In affirming the ALJ, OSHRC upheld the admission of evidence obtained during an inspection of Smith's facilities conducted under an invalid inspection warrant. Smith challenges both OSHRC's refusal to apply the exclusionary rule and its decision to permit consideration of the illegally obtained evidence under the good faith exception to that rule. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We hold that under the principles announced in *Leon* and in *I.N.S. v. Lopez-Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), the exclusionary rule does not extend to OSHA proceedings conducted for the purpose of correcting violations of occupational safety and health standards. The rule is applicable, however, where the object of the proceeding is to punish the employer for past violations of OSHA regulations—unless the good faith exception applies.

## Facts

At a foundry in Marshall, Texas, Smith produces iron castings made to customer specifications. The casting process necessarily exposes some of Smith's employees to high levels of noise, silica dust, and copper fumes. In 1979, an OSHA compliance officer named Hogan conducted a general inspection of Smith's plant and noted potential hazards to the health of some Smith employees from air contaminants and excessive noise. Being unqualified to test for excessive levels of air contaminants or noise, Hogan referred his observations to the OSHA area director, who in turn assigned the matter for inspection to an industrial hygienist named Matthews. In January 1980, Matthews and an OSHA trainee concluded, after an initial walka-round inspection of the Smith foundry, that air sampling and noise monitoring were necessary, and made arrangements with Smith to return the following morning to begin the testing. The compliance officer who arrived the next morning, however, was denied access to the manufacturing area and told to wait. At last, after an hour, the company's president told him that he would not be permitted to enter the foundry, allegedly stating as the reason that the company did not have time to accompany the officer because they were busy abating all the violations earlier found by Hogan. The Secretary of Labor responded by applying to a United States Magistrate for an *ex parte* warrant to inspect and test Smith's plant for, among other things, overexposure to silica dust, copper fumes, and noise. The application was granted, the warrant was issued, the inspection conducted, and the testing done.

Based on evidence obtained by means of the warrant, OSHA issued citations to Smith alleging that feasible engineering controls to limit exposure to silica dust and copper fumes had not been installed, that Smith lacked an effective hearing conservation program, and that a number of regulations regarding the selection and use of respirators had been violated. Smith contested these citations on the merits, asserting that no violations had occurred and arguing as well that the evidence gathered during the inspection should be suppressed because it had been obtained under an invalid warrant. Administrative Law Judge Salyers concluded that the warrant was invalid under *Donovan v. Huffines Steel Co.,* 645 F.2d 288 (5th Cir.1981) (*Huffines*), in which this Court invalidated an administrative search warrant obtained *ex parte* by the Secretary of Labor. Accordingly, Judge Salyers suppressed the evidence and vacated the citations.

On appeal, OSHRC vacated Judge Salyers's decision and remanded the case. The Commission held that, under OSHA regulations in effect at the time the warrant was issued, the Secretary of Labor was authorized to obtain the warrant *ex parte,* thus permitting use of the evidence acquired during the inspection. *Smith Steel Casting Co.,* 82 OSAHRC 37/D10, 10 BNA OSHA 1764, 1982 CCH OSHD ¶ 26,-136 (No. 80–2069, 1982). On remand, Judge Salyers held an evidentiary hearing and affirmed the citations. OSHRC declined review of Judge Salyers's second decision and Smith appealed to us.

In *Smith Steel Casting Co. v. Donovan,* 725 F.2d 1032 (5th Cir.1984) (*Smith I*), we reiterated our holding in *Huffines* that the OSHA regulations in effect at the time of the challenged search of Smith's foundry did not authorize the issuance of an *ex parte* administrative search warrant. In *Smith I,* the Secretary did not contest the invalidity of the warrant or the striking of OSHRC's decision to ignore *Huffines.* Instead, he urged upon us that the tainted evidence was properly admitted on remand to Judge Salyers for one or both of two reasons. First, that *Huffines* should not be applied retroactively, second, that the good faith exception to the exclusionary rule was appropriately applicable to this case, citing *United States v. Williams,* 622 F.2d 830 (5th Cir.1980) (en banc), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). We observed in *Smith I* that both of these contentions might be meritorious, but declined to address either, holding that the Commission must first decide "what evidence will be considered on application of its own rules respecting exclusion and admission of evidence seized under an invalid warrant." *Smith I,* 725 F.2d at 1036. So noting, we remanded the case to OSHRC. The Commission held on remand that the evidence against Smith should not be suppressed, and Smith once again appeals to us.

### Power of the Secretary v. Power of the Commission

 The Secretary of Labor argues that OSHRC lacks authority either to apply the exclusionary rule or its good faith exception. Only he, the argument runs, is empowered to decide whether these evidentiary rules can be utilized by OSHRC, because he is the principal administrator and sole policy maker under the Occupational Safety and Health Act. Thus, the threshold question before us is whether the Secretary or the Commission, or both of them, has power under the Act to dictate whether the exclusionary rule and the good faith exception will be employed in proceedings before OSHRC.

This Court provided the answer in *Smith I* where we held:

The decision whether proceedings before the Review Commission shall be governed by either of these exceptions [a non-retroactivity rule or the good faith exception] to the exclusionary rule rests with the Commission. We will review the Commission's evidentiary rulings in individual cases only for Fourth Amendment reasonableness and non-arbitrary application.

*Smith I,* 725 F.2d at 1036 (brackets ours). Because the Secretary seriously challenges this *Smith I* ruling, however, and because *Smith I* did not explain our reasoning behind this holding, we do so today.

The legislative history of the Act makes clear what roles Congress intended for the Secretary and the Commission. *See generally* Staff of the Senate Comm. on Labor and Public Welfare, 92d Cong. 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970 (S. 2193, Pub.L. No. 91–596) (Comm.Print 1971) ("Legislative History"). The Secretary of Labor urges that the legislative and executive powers created by the OSH Act are delegated exclusively to the Secretary, noting that OSHRC has neither prosecution nor enforcement powers. Although we need not quarrel today with these contentions as general propositions, and while we recognize that the Secretary's rule-making authority is broad, we are concerned in today's case with the power to adopt rules and policies governing the process of *adjudication.* The Act places control of *adjudicatory* functions in the Commission. Furthermore, the lengthy Congressional debates and successful Senate floor amendment stripping the Secretary of authority over adjudication clearly establish that Congress deliberately created OSHRC to be an entity separate and independent of the Secretary of Labor.[1] *See* Legislative

---

1. The Commission's opinion of April 23, 1985 contained the following language: "In Chairman Buckley's view, the Commission can impose sanctions on the Secretary for violations of

History, 388–91, 462–64, 470–73, 1147 (text of amendment and remarks of Senator Javits—sponsor of the amendment—and Senators Holland, Dominick, and Williams).

We are not alone in recognizing that adjudicatory functions rest with the Commission by deliberate Congressional design. *Brock v. Schwarz-Jordan, Inc.,* 777 F.2d 195, 197 (5th Cir.1985); *Donovan v. A. Amorello & Sons, Inc.,* 761 F.2d 61, 65 (1st Cir.1985); *Donovan v. International Union, Allied Industrial Workers,* 722 F.2d 1415, 1421 (8th Cir.1983); *Donovan v. O.S. H.R.C.,* 713 F.2d 918, 930–31 n. 21 (2d Cir.1983); *Oil, Chemical & Atomic Workers v. O.S.H.R.C.,* 671 F.2d 643, 651 (D.C. Cir.), *cert. denied* 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982); *Marshall v. O.S.H.R.C.,* 635 F.2d 544, 547 (6th Cir. 1980); *Marshall v. Sun Petroleum Products Co.,* 622 F.2d 1176, 1180–84 (3d Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); [2] *International Union v. O.S.H.R.C.,* 557 F.2d 607, 610 (7th Cir.1977); *Brennan v. Giles & Cotting, Inc.,* 504 F.2d 1255, 1262 (4th Cir.1974);

*Dale M. Madden Construction v. Hodgson,* 502 F.2d 278 (9th Cir.1974). Furthermore, Congress has mandated, "The Commission is authorized to make such rules as are necessary for the orderly transaction of its proceedings." 29 U.S.C. § 661(g) (1982). Accordingly, OSHRC has promulgated 29 C.F.R. § 2200.72, which provides: "Hearings before the Commission and its judges shall be in accordance with section 554 of Title 5 U.S.C. and insofar as practicable *shall* be governed by the rules of evidence applicable in the United States District Courts." 29 C.F.R. § 2200.72 (1985) (emphasis added). After *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (*Leon*), it is scarcely open to dispute that the exclusionary rule and its good faith exception are "applicable in the United States District Courts." Because Commissioner Buckley, by implication, and Commissioner Cleary, by expression, chose to admit the evidence against Smith under the good faith exception to the exclusionary rule, we can assume that the Commission concluded that the application

constitutional, statutory, or regulatory requirements. The Commission can do so in the exercise of *its supervisory authority over the Act's enforcement." Smith Steel Casting Co.,* 12 O.S. H.C. (BNA) 1277, 1984–85 Occup. Safety and Health Dec. (CCH) ¶ 27,263 at 35,234 (1985) (emphasis added). We take this opportunity to point out that the Commission has supervisory authority over the *adjudication* of enforcement actions under the Act—it has no supervisory authority over the Act's enforcement. The notion that OSHRC has general supervisory authority over administration of the OSH Act appears to derive from the Third Circuit's *obiter dictum* in *Babcock & Wilcox Co. v. Marshall,* 610 F.2d 1128, 1139 (3rd Cir.1979). That language in *Babcock & Wilcox* was not necessary to the decision in that case, which held that the doctrine of exhaustion of remedies applies to constitutional issues arising in cases where OSHA has conducted inspections and issued citations. It is clear from our examination of the legislative history and case law that enforcement of the Act rests with the Secretary—not the Commission. *See, e.g., Marshall v. Sun Petroleum Products Co.,* 622 F.2d 1176, 1183 (3d Cir.) *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980). Furthermore, there is a danger that Chairman Buckley's words may be misconstrued: "The Commission can impose sanctions on the Secretary for violations of con-

stitutional, statutory, or regulatory requirements." If Chairman Buckley means that the Commission may sanction the Secretary by applying the exclusionary rule under certain circumstances, he is correct. If he means that OSHRC can sanction the Secretary, for example, by imposing fines, he is clearly incorrect. The Commission's jurisdiction is triggered in only two instances: (1) when a cited employer files a notice of contest to a citation issued by the Secretary, or (2) when an employee challenges an abatement date as unreasonable. The Commission's sole function is then to "issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's citation or proposed penalty, *or directing other appropriate relief....*" 29 U.S.C. § 659(c) (1982) (emphasis added). We do not read "directing other appropriate relief" as permission for OSHRC to sanction the Secretary of Labor by imposing penalties upon him.

2. "We therefore conclude that the Review Commission was designed strictly as an independent adjudicator, with no rule-making authority *other than for procedural rules for hearings ...*" *Marshall v. Sun Petroleum Products Co.,* 622 F.2d 1176, 1184 (3d Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980) (emphasis added).

of these evidentiary rules in proceedings before OSHRC is practicable. Thus, the Commission has complied with 29 C.F.R. § 2200.72 (1985), and 29 U.S.C. § 661(g) (1982), and has acted in accordance with the power Congress intended to give it. Accordingly, it seems that we should affirm the Commission's decision to apply the exclusionary rule and its good faith exception in this case.

### The Effect of I.N.S. v. Lopez-Mendoza.

But there is a hitch. After our decision in *Smith I*, the United States Supreme Court decided *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (*Lopez-Mendoza*). That case held that the exclusionary rule barring admission of evidence obtained in violation of the Fourth Amendment does not apply to deportation hearings. Writing for the majority, Justice O'Conner reasoned:

> Presumably no one would argue that the exclusionary rule should be invoked to prevent an agency from ordering corrective action at a leaking hazardous waste dump if the evidence underlying the order had been improperly obtained, or to compel police to return contraband explosives or drugs to their owner if the contraband had been unlawfully seized. On the rare occasions that it has considered costs of this type the Court has firmly indicated that the exclusionary rule does not extend this far. *See United States v. Jeffers*, 342 U.S. 48, 54 [72 S.Ct. 93, 96, 96 L.Ed. 59] (1951); *Trupiano v. United States*, 334 U.S. 699, 710 [68 S.Ct. 1229, 1234, 92 L.Ed. 1663] (1948).... The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime.

*I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1046–47, 104 S.Ct. 3479, 3488–89, 82 L.Ed.2d 778 (1984). Although the Supreme Court has never ruled upon the applicability of the exclusionary rule to proceedings before OSHRC, we are placed by *Lopez-Mendoza* in the position of trying to deter-

mine what the Supreme Court would hold if confronted with the issue. Based on Justice O'Conner's reasoning, we do not believe that the exclusionary rule should be invoked to prevent the Secretary of Labor from ordering correction of OSHA violations involving unsafe or unhealthy working conditions, even though the evidence supporting the order was improperly obtained. However, illegally obtained evidence must be excluded for purposes of "punishing the crime," i.e. the exclusionary rule should be applied for purposes of assessing penalties against an employer after the fact for OSHA violations, unless it can be shown that the good faith exception applies to the Secretary's actions. Therefore, we hold pursuant to *Lopez-Mendoza* that the exclusionary rule does not extend to OSHA enforcement actions for purposes of correcting violations of occupational safety and health standards. Further, again under Justice O'Conner's reasoning in *Lopez-Mendoza*, we hold that the exclusionary rule applies where the object is to assess penalties against the employer for past violations of OSHA regulations, *unless*, under the reasoning announced in *Leon*, the good faith exception can be applied to the Secretary's actions in obtaining the tainted evidence.

### Other Contentions Advanced by the Parties.

■ Smith advances a number of arguments for reversing the Commission's decision regarding consideration of the tainted evidence. To begin with, according to Smith, the Commission decision was not supported by a quorum as required by 29 U.S.C. § 661(f) (1982). In the same breath, the employer argues that the Commission decision does not comport with the Court's remand order in *Smith I* because Commission Chairman Buckley did not rule on Smith Steel's contention that the administrative search warrant was overly broad.

OSHRC is ordinarily composed of three members, 29 U.S.C. § 661(a) (1982), but there was a vacancy in its membership when it decided this case. The quorum

requirement is contained in 29 U.S.C. § 661(f), which provides,

> For the purpose of carrying out its functions under this chapter, two members of the Commission shall constitute a quorum and official action can be taken only on the affirmative vote of at least two members.

29 U.S.C. § 661(f) (1982).

In *Smith I,* we remanded this case to OSHRC for a determination of whether evidence gathered pursuant to the invalid *ex parte* warrant was subject to the exclusionary rule or any exception to it in proceedings before the Commission. On remand, both Commissioners ruled that the evidence should not be excluded. Each then proceeded to explain his reasons for admitting the evidence. Although their remarks are scarcely the picture of clarity, it is apparent that both Commissioners concluded the evidence should be admitted pursuant to the good faith exception to the exclusionary rule announced in *Leon.* Accordingly, we view this as an affirmative vote by each Commissioner, thus meeting the quorum and official action requirements.

■ As for Smith's contention that Commissioner Buckley did not rule on Smith's overbroad-warrant argument, we find this challenge irrelevant. In *Smith I* we held the *ex parte* warrant in question to be invalid under *Huffines.* By advancing its over-broad warrant claim to the Commission, Smith was asking OSHRC to hold that the warrant was invalid for a second reason—over-breadth. One reason was enough. We had already held that the evidence gathered under this warrant was tainted by the warrant's invalidity under *Huffines.* The Commission was not required to consider the claim that the evidence was "double-tainted" because of overbroadness. Because the Commission did, indeed, decide that evidence gathered pursuant to an *ex parte* warrant was subject to the exclusionary rule and its good

faith exception, we find no failure by OSHRC to comply with our remand order.

■ Smith also insists that OSHRC was unwarranted in applying the good faith exception because there are no facts in the case to support a finding of "good faith" on the part of the Secretary, citing *Donovan v. Sarasota Concrete Co.,* 693 F.2d 1061 (11th Cir.1982) (*Sarasota Concrete*):

> [I]t would be difficult to apply the exception to the facts of this case. The Secretary claims that when OSHA applied for the warrant to inspect Sarasota, *district courts were split on the issue of whether a specific complaint could support a full scope inspection.* In essence, OSHA officials decided to risk a questionable search and now expect to escape responsibility by alleging good faith. Such risk taking with the constitutional rights of others hardly can be characterized as acting in good faith. Moreover, OSHA applied for a full scope investigation solely on the basis of Storey's truck complaint. The complaint was over six months old at the time of application and OSHA apparently took no steps to validate the claim. Although this delay and failure to validate does not defeat a determination of probable cause to inspect the truck area, these oversights do not help the Secretary's allegation of good faith.

*Sarasota Concrete,* 693 F.2d at 1072 (emphasis added). First, it is obvious from the language just quoted that the facts of *Sarasota Concrete* were different from those of today's case. Second, both Commissioners in the April 1985 decision in *Smith Steel* went to painstaking lengths to point out that by the time the Secretary applied for the inspection warrant in this case, one circuit court and three district court decisions had upheld the validity of *ex parte* warrants under 29 C.F.R. § 1903.4 (1980) as the regulation existed at that time. Only two district courts had held to the contrary, and none of the six decisions were binding on the Secretary in cases arising in the Eastern District of Texas where Smith is located. Therefore, we up-

hold the Commission's finding of the Secretary of Labor's good faith in obtaining the inspection warrant.

■ Finally, Smith submits that the Court cannot accept the Commission's decision to apply the good faith exception because OSHRC reversed its existing precedent without explaining its departure from it. In *Secretary of Labor v. Sarasota Concrete Co.*, 9 BNA OSHC 1608 (1981), *aff'd*, 693 F.2d 1061 (11th Cir.1982),³ the Commission declined to adopt the good faith exception to the exclusionary rule for use in its proceedings. Smith does not argue that OSHRC cannot change its position on this issue; the employer merely contends that the Commission cannot change its mind without supplying "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston T.V. Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (footnote omitted). But Smith closes its eyes to the fact that both Commissioners articulated their reliance on the principles of *Leon*, an invalid warrant case, for their decision to apply the good faith exception.⁴ We make two observations: (1) that OSHRC did, indeed, supply a reasoned analysis for its ruling, relying on recent Supreme Court precedent, and (2) to hold that OSHRC cannot adopt the principles of *Leon* without expressly declaring that it will not follow *Sarasota Concrete* would be impermissible nit-picking on our part. Administrative decisionmakers must be free to fashion their rulings in accordance with the evolution of the law. For us to hold otherwise would freeze the development of administrative law. So long as the

administrative agency provides us with something more substantial than an unreasoned, arbitrary, diktat as the basis for its decision, this Court may review the agency's findings. *See NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); K. Davis, *Administrative Law Treatise* (2d ed. 1983) § 20:11.

■ Turning to the Secretary's contentions, he urges that the evidence against Smith obtained by means of the warrant should be admitted because our decision in *Huffines* should not be applied retroactively. As we mentioned earlier in today's opinion, *Huffines* was decided after the *ex parte* warrant was issued to inspect Smith's premises. As we noted above, *Huffines* held that *ex parte* OSHA inspection warrants were invalid because the OSHA regulations in effect at that time did not authorize the issuance of *ex parte* administrative search warrants. Under *Huffines*, evidence obtained through execution of an *ex parte* warrant must be excluded. But if *Huffines* is not applied retroactively, as the Secretary desires, then the inspection warrant was perfectly valid and all evidence against Smith is admissible. As we have already held today that the evidence is admissible under the good faith exception to the exclusionary rule, there is no need to determine whether *Huffines* should be applied retroactively or not. Under the facts of this case, Smith cannot exclude the evidence obtained in the inspection, regardless of whether *Huffines* is applied prospectively or retroactively.

### The Citations

Smith contends that Administrative Law Judge Salyers improperly affirmed the cita-

---

3. We note that the Eleventh Circuit in *Donovan v. Sarasota Concrete Co.*, 693 F.2d 1061 (1982), held that OSHRC was not bound to apply the good faith exception announced in *United States v. Williams*, 622 F.2d 830 (5th Cir.1980) (en banc), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), but did not rule that OSHRC is prohibited from adopting the good faith exception.

4. *Leon* was decided after *Smith I*, while *Leon*'s forerunner, our circuit's en banc decision in *Williams*, 622 F.2d 830 (5th Cir.1980) (en banc), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), was not a warrant case.

tions against it. The following citations are at issue:

1. *Item 2A, Citation No. 1.* Noncompliance with § 1910.134(a)(2) for failure to "establish and maintain a respiratory protection program" on February 26 and 27, 1980 for three specified employees.[5]

2. *Item 2B, Citation No. 1.* Noncompliance with § 1910.134(b)(1) for failure to establish "[w]ritten standard operating procedures governing the selection and use of respirators" for the same employees on the same calendar dates.

3. *Item 2C, Citation No. 1.* Noncompliance with § 1910.134(b)(3) because the same employees on the same dates "were not instructed and trained in the proper use of respirators and their limitations."

4. *Item 2D, Citation No. 1.* Noncompliance with § 1910.134(b)(5) because "[r]espirators were not regularly cleaned and disinfected" for the same employees on the same dates.

5. *Item 2E, Citation No. 1.* Noncompliance with § 1910.134(b)(9), covering the same employees on the same dates, because "[t]here were no regular inspections and evaluations to determine the continued effectiveness of the respirator program."

---

5. 29 C.F.R. § 1910.134 states, in pertinent part:

(a) *Permissible practice.* (1) In the control of those occupational diseases caused by breathing air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors, the primary objective shall be to prevent atmospheric contamination. This shall be accomplished as far as feasible by accepted engineering control measures (for example, enclosure or confinement of the operation, general and local ventilation, and substitution of less toxic materials). When effective engineering controls are not feasible, or while they are being instituted, appropriate respirators shall be used pursuant to the following requirements.

(2) Respirators shall be provided by the employer when such equipment is necessary to protect the health of the employee. The employer shall provide the respirators which are applicable and suitable for the purpose intended. The employer shall be responsible for the establishment and maintenance of a respiratory protective program which shall include the requirements outlined in paragraph (b) of this section.

(3) The employee shall use the provided respiratory protection in accordance with instructions and training received.

(b) *Requirements for a minimal acceptable program.*

(1) Written standard operating procedures governing the selection and use of respirators shall be established.

(2) Respirators shall be selected on the basis of hazards to which the worker is exposed.

(3) The user shall be instructed and trained in the proper use of respirators and their limitations.

(4) Where practicable, the respirators should be assigned to individual workers for their exclusive use.

(5) Respirators shall be regularly cleaned and disinfected. Those issued for the exclusive use of one worker should be cleaned after each day's use, or more often if necessary. Those used by more than one worker shall be thoroughly cleaned and disinfected after each use.

(6) Respirators shall be stored in a convenient, clean, and sanitary location.

(7) Respirators used routinely shall be inspected during cleaning. Worn or deteriorated parts shall be replaced. Respirators for emergency use such as self-contained devices shall be thoroughly inspected at least once a month and after each use.

(8) Appropriate surveillance of work area conditions and degree of employee exposure or stress shall be maintained.

(9) There shall be regular inspection and evaluation to determine the continued effectiveness of the program.

(10) Persons should not be assigned to tasks requiring use of respirators unless it has been determined that they are physically able to perform the work and use the equipment. The local physician shall determine what health and physical conditions are pertinent. The respirator user's medical status should be reviewed periodically (for instance, annually).

(11) Approved or accepted respirators shall be used when they are available. The respirator furnished shall provide adequate respiratory protection against the particular hazard for which it is designed in accordance with standards established by competent authorities. The U.S. Department of Interior, Bureau of Mines, and the U.S. Department of Agriculture are recognized as such authorities. Although respirators listed by the U.S. Department of Agriculture continue to be acceptable for protection against specified pesticides, the U.S. Department of the Interior, Bureau of Mines, is the agency now responsible for testing and approving pesticide respirators.

6. *Item 2F, Citation No. 1.* Noncompliance with § 1910.1000(c) because the same employees on the same dates "were exposed to material(s) in excess of the 8–hour time weighted average limit(s) listed for that material(s) in table Z–3 of subpart Z of 29 C.F.R. part 1910."[6]

7. *Item 2G, Citation No. 1.* Noncompliance with § 1910.1000(e) because "[f]easible administrative or engineering controls were not determined and implemented" to reduce the exposures of the same employees on the same dates.

8. *Item 1, Citation No. 2.* Noncompliance with § 1910.134(b)(2) on the same dates because the "respirator worn by the Air-Arc Gouger operator did not provide adequate protection from [copper] welding fumes" which were "in excess of the permissible exposure limit specified in 1910.1000(a)(2)."

9. *Item 2, Citation No. 2.* Noncompliance with § 1910.1000(a)(2) because the same employee on the same dates was exposed to the same copper fumes.

█ 29 U.S.C. § 660(a) (Supp. II 1984) commands that we affirm the findings of the Commission if they are supported by substantial evidence.[7] We have examined 39 exhibits and over 800 pages of testimony adduced at the trial on the merits of these citations. Judge Salyers's thorough, well-reasoned opinion is attached as Appendix A. We find that the evidence in the record supports his conclusions with regard to all the citations regarding the selection and use of respirators. Accordingly, we affirm Items 2A, 2B, 2C, 2D, 2E, Citation No. 1; and Item 1, Citation No. 2.

█ We have two problems with the other three alleged violations regarding excessive employee exposure to dust or fumes and the lack of engineering controls to limit this exposure. First, Smith advances an argument that neither Judge Salyers, nor the Commission, nor the Secretary has considered. On pages 45 and 46 of its brief to us, Smith contends that the version of 29 C.F.R. § 1910.1000 (1980) at issue in this case is invalid and unenforceable because it was not adopted pursuant to the rulemaking procedure provided in 29 U.S.C. § 655(b) (1982). Smith advanced this argument to Judge Salyers in its post trial brief, but the judge ignored it. The Secretary in

---

6. 29 C.F.R. § 1910.1000 provides, in pertinent part:

An employee's exposure to any material listed in table Z–1, Z–2, or Z–3 of this section shall be limited in accordance with the requirements of the following paragraphs of this section.

(a) Table Z–1:

(1) *Materials with names preceded by "C"— Ceiling Values.* An employee's exposure to any material in table Z–1, the name of which is preceded by a "C" (e.g., C Boron trifluoride), shall at no time exceed the ceiling value given for that material in the table.

(2) *Other materials—8–hour time weighted averages.* An employee's exposure to any material in table Z–1, the name of which is not preceded by a "C," in any 8–hour work shift of a 40–hour work week, shall not exceed the 8–hour time weighted average given for that material in the table.

\* \* \* \* \* \*

(c) Table Z–3: An employee's exposure to any material listed in table Z–3, in any 8–hour work shift of a 40–hour work week, shall not exceed the 8–hour time weighted average limit given for that material in the table.

\* \* \* \* \* \*

(e) To achieve compliance with paragraph (a) through (d) of this section, administrative or engineering controls must first be determined and implemented whenever feasible. When such controls are not feasible to achieve full compliance, protective equipment or any other protective measures shall be used to keep the exposure of employees to air contaminants within the limits prescribed in this section. Any equipment and/or technical measures used for this purpose must be approved for each particular use by a competent industrial hygienist or other technically qualified person. Whenever respirators are used, their use shall comply with § 1910.134.

The two materials at issue in Smith's foundry were copper fumes and silica dust. The administrative law judge found that three employees were exposed to excessive crystalline silica and one employee was exposed to excessive copper fumes.

7. 29 U.S.C. § 660(a) (Supp. II 1984) provides, in pertinent part: "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."

his brief to our court also chose to ignore this contention. It is our preference to allow the Commission to address such an argument in the first instance, so we remand Items 2F and 2G, Citation 1; and Item 2, Citation 2 to OSHRC for consideration in light of Smith's improperly promulgated regulation argument.

■ Second, we find that the Secretary has not met his burden of proving the economic feasibility of his suggested engineering controls to limit employee exposure to silica dust.[8] *See Texas Independent Ginners Ass'n v. Marshall*, 630 F.2d 398, 414 (5th Cir.1980). The Secretary introduced into evidence a study suggesting two new sand handling systems which would reduce employee exposure to silica dust at Smith Steel's foundry. (Exhibit C–36 in the record). One system was estimated to cost $281,300 to purchase and install, with an annual operating cost of $74,100. The other system would cost approximately $145,300 installed, with a yearly cost to operate of $41,100.[9] Judge Salyers, in determining whether these systems would be economically feasible for Smith wrote:

> The evidence reflects, during the year preceding the inspection, respondent had a gross income of $7,096,499.55 with a net profit of $480,316.85 (Respondent's Answers to Complainant's Interrogatories. Nos. 4 & 6; Judge's Exhibit J–18). Except for the introduction of these figures, counsel for the Secretary made no further effort to establish the economic ability of the respondent to implement the controls. By the same token counsel for respondent did not see fit to offer any evidence on this point, and no showing was made that the respondent is unable to afford the controls. In the ab-

sence of a showing that implementation of the controls are beyond the financial means of the respondent and, in view of the obvious benefits to be derived by reducing to a significant degree the exposure of employees to toxic substances, it is concluded the Secretary has carried his burden.

*Secretary of Labor v. Smith Steel Casting Co.*, OSHRC Nos. 80–2069, 80–2322, slip op. at 22–23 [*infra* at 1350] (Nov. 30, 1982). Without a more complete picture of Smith's financial condition, we cannot uphold Judge Salyers's conclusion that the Secretary has proven economic feasibility as supported by substantial evidence. Our problem is not so much insubstantial evidence as insufficient evidence. We have no way of knowing whether these gross income and net profit figures represent a typical year for Smith. For all we know, Smith may have operated at a loss for the three preceding years or for the three succeeding years. We are vitally concerned with the health of the three out of 250 Smith employees who are over-exposed to silica dust, but we are unwilling to risk putting Smith Steel out of business or into our overcrowded bankruptcy courts by forcing Smith to revamp its sand handling system completely without any real idea whether Smith can survive such a costly renovation. If it cannot, the law as it presently stands allows Smith to protect its employees from the harmful silica dust in the foundry by implementing an effective respirator program. Therefore, we remand Items 2F and 2G of Citation 1 to the Commission for the receipt of additional evidence on the issue of economic feasibility.

AFFIRMED in part, VACATED in part, and REMANDED.

8. The Secretary's suggested engineering controls to reduce exposure to copper fumes were estimated to be insignificantly expensive compared with the proposed new sand handling systems. Accordingly, we chose not to challenge the Secretary on the economic feasibility of the engineering controls to limit employee exposure to copper fumes.

9. Our review of this study and its preparer's responses to cross-examination by Smith's lawyer leaves us in doubt as to the accuracy of the dollar figures contained in it. The amounts appear to be preliminary guesstimations, and we are left unsure as to what these new sand handling systems might actually cost.

APPENDIX A

UNITED STATES OF AMERICA

OCCUPATIONAL SAFETY AND
HEALTH REVIEW
COMMISSION

1365 PEACHTREE STREET,
N.E., SUITE 240

ATLANTA, GEORGIA 30309

SECRETARY OF LABOR, Complainant,

v.

SMITH STEEL CASTING
COMPANY, Respondent.

OSHRC Docket Nos. 80–2069
and 80–2322

APPEARANCES:

Robert A. Fitz, Esquire, Office of the
Solicitor, U.S. Department of Labor, Dallas, Texas, on behalf of complainant

Robert D. Moran, Esquire, Washington,
D.C., on behalf of respondent

Ernest F. Smith, Esquire, Marshall, Texas, on behalf of respondent

DECISION AND ORDER

SALYERS, Judge:

The respondent, Smith Steel Casting Company, is engaged in the production of iron castings made to customer specifications at a foundry located in Marshall, Texas. This plant covers some forty acres of land and consists of some twelve to fifteen separate buildings. In late 1979, a compliance officer of the Occupational Safety and Health Administration conducted a routine inspection of respondent's foundry and noted, among other things, potential hazards to employees' health stemming from suspected air contaminants and excessive noise. The compliance officer further noted that employees were wearing no hearing protection or respirators. Since this compliance officer was not qualified to test in these areas, this information was passed along to the OSHA Area Director who as-

signed the matter for inspection to industrial hygienist Jack M. Matthews, Jr.

On January 22, 1980, Compliance Officer Matthews arrived at respondent's foundry and presented his credentials to Mrs. Geraldine Mauthe, respondent's vice-president, personnel director and safety officer (Tr. 46–47). In the company of Mrs. Mauthe, the compliance officer then proceeded to make a walkaround inspection of the plant. He observed an employee at the coremaking machine had visible quantities of dust on his person and was potentially exposed to airborne dust containing crystalline silica (Tr. 48). He observed this same condition existed with respect to sand muller operators (Tr. 49) and floor molders (Tr. 55). At the air-arc gouger operation, it appeared that the operator was exposed to excessive levels of noise (Tr. 61) and copper fumes (Tr. 62). Using a sound level meter, the compliance officer took readings reflecting excessive levels of noise (Tr. 64–65). At the conclusion of this initial walkaround inspection, the compliance officer conferred with Mrs. Mauthe who at that time was joined by Mr. Gerald Smith, president of the company, and explained that preliminary assessments indicated employees were exposed to excessive noise levels and excessive air contaminants (Tr. 79). It was further explained that, in order to affirm or negate the suspected hazards, it would be necessary to conduct certain testing. Arrangements were made to come back the following morning to initiate the monitoring (Tr. 79).

On the following day a compliance officer [1] returned to respondent's steel foundry to conduct noise samplings. Upon arrival, he was advised by Mrs. Mauthe and Mr. Smith that a continuation of the inspection would not be permitted (Tr. 95). Shortly thereafter, the Secretary applied for, and was granted, an *ex parte* warrant by the United States Magistrate specifically permitting the Secretary or his agents to inspect the plant and premises of respondent

---

1. This phase of the inspection was conducted by Compliance Officer Thornhill since Matthews was summoned to jury duty (Tr. 95).

to determine overexposure of employees to silica dust, copper fumes and noise. On February 26 and 27, 1980, the compliance officer (Matthew) returned to respondent's premises and conducted the inspection which forms the basis for this proceeding.

After extensive prehearing discovery, these two consolidated cases were tried in Shreveport, Louisiana, during the period April 21 to 24, 1981. The record in the case consists of a transcript of 880 pages containing the testimony of the compliance officer, an expert in the field of medical toxicology, and two analytical chemists employed by the Occupational Safety and Health Administration, together with 39 exhibits offered by the parties. Respondent called no witnesses. Both parties have submitted post-trial briefs.

At the outset of the trial, the Secretary announced, due to a mistaken assumption, a complaint had not been filed in this matter and moved the court to permit a complaint to be filed out of time and to amend the original citations in this case to reflect the correct dates of the inspections. Respondent did not object to the late filing of the complaint but vigorously objected to the amendment of the citation (Tr. 8). The original citation bore the date of January 22, 1980, the date on which the initial walkaround inspection was conducted. The actual dates of the inspection upon which this case is predicated were February 26 and 27, 1980. Respondent claimed the motion came as a surprise and that its allowance would prejudice respondent in the presentation of its defense. After considerable discussion (Tr. 10–32), it was ascertained that the only prejudice occasioned by the amendment would relate to respondent's cross-examination of the compliance officer. Counsel for respondent contended he had assembled certain company records relating to the movement of sand through the plant on the date originally specified in the citation and that additional time would be required to obtain these records for the corrected dates. After due consideration,

the amendment was allowed with the understanding that cross-examination of the compliance officer would be deferred until counsel for respondent could obtain and study the necessary records. Early adjournments of the hearing were granted on the first two days of trial to afford counsel for respondent time to prepare to question the compliance officer who was finally cross-examined on the third day of trial.[2] Under these circumstances, whatever prejudice respondent may have suffered as a result of the amendment was cured.

### Suppression of Evidence and Remand

At trial and in its post-hearing brief, respondent advanced its first-line defense that all evidence in this matter should be suppressed because the warrant in this case was issued *ex parte* and was overly broad since it placed no time limits on the inspection, allowed private questioning of respondent's employees, authorized fixing equipment upon employees to test for air quality and noise levels, authorized examination of employer's records, and was unlimited in scope. Finding this argument convincing and following the doctrine laid down in *Donovan v. Huffines Steel Company*, 645 F.2d 288 (5th Cir.1981), the undersigned, by order dated August 25, 1981, suppressed the evidence in the case and dismissed the complaint and citation. Upon appeal to the Review Commission, it was held that the Secretary had authority to obtain the *ex parte* warrant and that both the warrant and the inspections conducted under the warrant were valid. *Secretary v. Smith Steel Casting Company*, —— OS-AHRC ——, —— BNA OSHC ——; —— CCH OSHD ¶ —— (No. 80–2775, June 30, 1982). Accordingly, the case is now before the undersigned upon remand to decide the case upon its merits.

### The Issues

The issues remaining for resolution are as follows:

---

**2.** The record contains certain references to the movement of sand through the plant, but no company records in this regard were produced or offered at trial.

1. Did respondent seriously violate the provisions of 29 C.F.R. § 1910.95(b)(3) by exposing employees to noise in excess of the levels permitted in the standard without providing a continuing, effective hearing conservation program?

2. Did respondent violate the provisions of 29 C.F.R. § 1910.134 by exposing employees to silica dust and copper fumes in excess of permissible levels without providing adequate respiratory protection?

a. If employees were exposed to excess silica dust and copper fumes, did the Secretary establish that feasible administrative or engineering controls are available to reduce employee exposure as required by 29 C.F.R. § 1910.1000?

### Noise

Pursuant to the warrant, the compliance officer returned to the establishment at 8:00 a.m. on February 26, 1980, to conduct an all-day sampling of noise in those areas believed to expose employees to excessive noise levels (Tr. 103). A dosimeter was attached to each employee. This detection device consisted of a microphone which is placed near the employee's hearing zone and is connected to a small instrument that is worn on the belt or in a shirt pocket that records sound pressure levels. These sound level pressures are converted to an electronic signal which in turn is stored on the capacitor within the dosimeter (Tr. 104). At the end of the workday, the instrumentation is removed from the employee and the capacitor is placed in a readout device which provides an integrated digital display of the total percentage of noise to which the capacitor was exposed during the testing period (Tr. 104–105). Throughout the testing period, the compliance officer periodically checked the equipment to be sure it was working properly and took sample readings of noise levels with another device called a sound level meter. Upon completion of the testing procedures, a data sheet was prepared for each of the employees found to have been exposed to excessive noise levels (Ex. C–5, C–6, C–7, C–8).

Typical results were obtained in the testing of Roosevelt Morris (Ex. C–5) who operated a shop-made, stationary bench grinder in the finishing department. This employee was tested for a total of 450 minutes during the workday and, using the data collected by the dosimeter, was exposed to a dBA of 95.0 [3] for the tested period. The following reflects the times when the compliance officer checked the equipment for proper function and took sound level meter readings, together with the indication of whether the grinder was operative or idling.

| Time | dBA | dBC | Location of Test and Remarks |
|------|-----|-----|------------------------------|
| 10:51 | 93 | 96 | Grinder idling |
| 11:20 | 92–96 | 98 | Grinder operating |
| 11:54 | 92–93 | 92 | Grinder idling |
| 2:07 | 94–98 | 98–100 | Grinder operating |
| 3:03 | 93–95 | 95 | Grinder operating |
| 4:07 | 92–94 | 96 | Grinder operating |

Similar results and exposure to noise were determined in the case of Hector Deal (Ex. C–6), operating a swing grinder; L.C. Smith, operating a chipping hammer in the finishing department (Ex. C–7); and Valentine Nunis Losorio (Ex. C–8), operating an air-arc gouger machine. On the day of the inspection, all employees except L.C. Smith were wearing EAR self-molding plugs which conform to OSHA requirements (Tr. 448). Smith was wearing a Norton Com-fit plug which does not meet OSHA requirements (Tr. 446).

While counsel for respondent vigorously cross-examined the compliance officer in an attempt to discredit the results obtained in the testing procedure, the evidence fully supports a conclusion that correct procedures were followed and that the results obtained are accurate. The procedures followed in making the test for noise exposure were those outlined in the *Field Operations Handbook*. The compliance officer calibrated each dosimeter and carefully checked the equipment periodically throughout the day (Tr. 132–137). There is no indication in the record that any of the equipment malfunctioned. The readings taken with the sound level meter confirm

---

**3.** The standard prohibits exposure in excess of 90.0 dBA.

the results obtained on the dosimeter in each case. I, therefore, find as a fact that at least four of respondent's employees were exposed to noise levels in excess of that permitted by the standard.

The Secretary does not seek relief by way of engineering or administrative controls with respect to the hearing hazard. At trial, counsel for the Secretary conceded that such controls are not feasible under the circumstances of this case (Tr. 123). What the Secretary seeks in this case is that the respondent formulate and implement a continuing, effective hearing conservation program as contemplated by the standard.

At the time of the inspection, respondent had no structured program for hearing conservation even though it did provide earplugs to employees upon request (Tr. 82–83). The record is void of any evidence that respondent instructed employees in the use of plugs, required the wearing of plugs, or conducted any audiometric testing to determine the effectiveness of its program. The failure to implement any meaningful program to provide a continuing, effective hearing conservation program clearly violates the standard.

Respondent attacks the standard on grounds that it is too vague to be enforceable. In particular, he cites the Secretary's vacillation insofar as a requirement in the program for audiometric testing. In 1972 the Occupational Safety and Health Administration published a booklet entitled *Noise—The Environmental Standard—A Guide to OSHA Standards.* An excerpt from this publication reads as follows:

Since audiometric tests are not specifically mentioned in the regulations, they are not specifically required. They are strongly recommended as a check on control measures.

Again on June 24, 1974, the Occupational Safety and Health Administration issued its Field Information Memorandum No. 74–48 which was published at "New Developments," paragraph 9404, in the *Employment Safety and Health Guide* of Commerce Clearing House reiterating the De-

partment's policy of not requiring audiometric testing. However, on June 4, 1979, the *Industrial Hygiene Field Operations Manual* was amended to provide, in pertinent part, as follows:

For compliance purposes, a minimally effective hearing conservation program consists of the following items:

(1) A baseline audiogram for all employees exposed to noise levels equal to or in excess of the standard.

(2) Periodic audiograms for each overexposed employee.

(3) Analysis of audiogram results with retesting and/or referral to an otolaryngologist or qualified physician when a significant threshold shift occurs. A significant shift will be considered to be equal to or greater than 20 dB at any test frequency.

NOTE: If hearing loss has been determined to be occupationally related, the loss is required to be recorded on the OSHA Form 200.

(4) Where insert ear plugs or custommolder devices other than self-fitted, malleable plugs are utilized, individual employee fitting shall be conducted by a trained person, and employees shall be instructed in the care and use of the devices.

Thereafter, OSHA Field Information Memorandum No. 74–48 was cancelled by OSHA Notice Admin. 8 issued on October 19, 1979 (*CCH Employment Safety and Health Guide,* "New Developments," paragraph 11,858). This aspect of the case was further complicated by the fact that counsel for the Secretary announced at trial that, because of the confusion on the point, the Government was not insistent that a hearing conservation program include periodic audiometric tests (Tr. 94). Later, this position was rescinded by counsel for the Secretary (Tr. 100–101).

In spite of the Secretary's vacillation on the need for audio testing in a hearing conservation program, logic and common sense dictate an "effective" program would require testing of employees to determine

that the program is achieving the desired results. How else would an employer know that its program is effective? In *Castle & Cooke Foods, Inc.*, 77 OSAHRC 87/A2, 5 BNA OSHC 1435, 1977–78 CCH OSHD ¶ 21,854 (No. 10925, 1977), *appeal filed,* No. 77–2565 (9th Cir., July 14, 1977), the Commission recognized that one element of a hearing conservation program "should be the provision of periodic hearing tests for employees exposed to excessive noise levels."

Respondent also asserts that the standard controverts the due process clause of the Constitution since it does not define the terms "continuing" and "effective" or otherwise advise an employer of the specific steps to be taken to insure compliance with the standard. On several occasions, the Commission has ruled that the noise standard is not unenforceably vague. *Castle & Cooke Foods, supra; Turner Company,* 76 OSAHRC 108/A2, 4 BNA OSHC 1554, 1976–77 CCH OSHD ¶ 21,023 (No. 3635, 1976), *rev'd on other grounds,* 561 F.2d 82 (7th Cir.1977); *Gannett Rochester Newspaper Corp.,* 81 OSAHRC 35/A2, 9 BNA OSHC 1590, 1981 CCH OSHD ¶ 25,323 (No. 6352, 1981). In *Boise Cascade Corporation,* 77 OSAHRC 43/A2, 5 BNA OSHC 1242, 1977–78 CCH OSHD ¶ 21,714 (No. 802, 1977), *aff'd as to noise issue,* 614 F.2d 199 (9th Cir.1980), the Commission, in specifically ruling on the question of whether 29 C.F.R. § 1910.95(b)(3) was unenforceably vague, stated (5 BNA OSHC at 1245):

The final issue presented is whether the standard at 29 CFR § 1910.95(b)(3) is unenforceably vague. We hold that it is not for the reasons given by Administrative Law Judge Burroughs in *The Singer Company-Furniture Division,* (No. 7134, November 20, 1974), *aff'd on other grounds by the Commission,* 3 BNA OSHC 2079, 1975–76 CCH OSHD ¶ 20,-481 (1976).

**4.** Section 17(k) of the Act provides:

For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or

Having found that employees of respondent were exposed to excessive noise levels and that the standard is not unenforceably vague, it must now be determined if the violations are "serious" as charged by the Secretary under section 17(k) of the Act.[4] A "serious" violation is one that can result in "death or serious physical harm." Hearing loss is a progressive process (Tr. 87) and is gradual rather than sudden. It is not life-threatening. However, continuous exposure over a long period of time could possibly result in total loss of hearing which could, of course, be considered "serious physical harm." It is noted here that all employees on the date of the inspection were wearing approved earplugs, and there is no evidence in this record that any employees have actually experienced a hearing loss. These violations are considered to appropriately fall into the "other" category of violations.

To abate this condition, respondent must immediately formulate and implement a continuing and effective hearing conservation program to include no less than the following:

1. The instruction and training of its employees in the care and use of earplugs.

2. An enforced program to insure the use of plugs where employees are exposed to excessive noise levels.

3. Periodic testing to determine the effectiveness of the program.

### Silica Dust

Serious Citation No. 1, items 2(a) through 2(e), charges respondent with a violation of 29 C.F.R. § 1910.134. In essence, this charge alleges that respondent has exposed employees to excessive levels of silica dust without establishing a respiratory protection program which included the following:

more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

1. Written standard operating procedures governing the selection and use of respirators.

2. Instructing and training employees in the proper use of respirators and their limitations.

3. The regular cleaning and disinfecting of respirators.

4. Regular inspection and evaluation to determine the continued effectiveness of the respiratory program.

On February 27, 1980, the compliance officer returned to respondent's facility to collect personal samples from those employees potentially exposed to dust containing silica (Tr. 144). Each employee to be sampled for silica dust was provided with a testing apparatus consisting of a battery-powered, air sampling pump which draws air through a cassette. The cassette contains a paper filter, and the sampling pumps are placed on the employee's belt towards the rear of his person. The cassette and sampling pump are connected by a piece of inert tygon tubing which serves to transport the air between the filter and the pump. The filter is placed on the employee's lapel or as close to his actual breathing zone as is technically feasible (Tr. 151–152).

On the day when the sampling was performed, each employee potentially exposed to silica was equipped with and wearing a Norton Model No. 7100V respirator, which is approved by the National Institute of Safety and Health for this type of contaminated atmosphere (Tr. 148). However, during the previous inspection conducted on January 22, 1980, these employees were wearing a 3M Model No. 8500 nontoxic dust mask which is not approved for use with dust containing crystalline silica (Tr. 151).

After placing the testing apparatus on the employees, the compliance officer made periodic checks of the sampling pump to insure that the batteries were operating properly and to check a flow meter attached to each sampling pump which indicates the exact amount of flow through the meter. The flow must remain constant in order to assure proper testing (Tr. 150). A data sheet was prepared by the compliance officer for each employee sampled (Tr. 145). This data sheet reflects pertinent information to assure compliance with proper procedures (Ex. C–9, C–10, C–11). In Mr. Mitchell's case three filters were used, with the first filter placed at 8:56 a.m. and the last filter removed at 4:20 p.m. (Tr. 153–154). His equipment was checked by the compliance officer on four occasions during the day and was in proper working order (Tr. 152–153). One of the employees tested was Steven Mitchell (Ex. C–9) who worked at the molding sand muller. Two other employees working in the muller area, Mose Anderson and Miguel Gomez Santacruz, were also tested under circumstances quite similar to that of Mitchell (Ex. C–10, C–11).

Care was taken by the compliance officer to assure the data collected on each employee tested was accurately and adequately identified (Tr. 155–157). Each filter was weighed prior to testing and again after the sampling had been performed to determine an accurate weight of the collected material. This weight differential was determined by the use of an electrobalance, a laboratory device that can measure small weight with great accuracy (Tr. 157–158). All equipment used in the testing procedure was calibrated and periodically examined to be sure it was working properly (Tr. 166–167). After removal of the filter from the employee, the compliance officer took careful steps to preserve the integrity of the filter which was placed in a cassette and sealed before shipment to the laboratory in Salt Lake City for further testing (Tr. 160–161).

The silica samples obtained in the testing procedures were sent to the Occupational Safety and Health Administration's analytical lab in Salt Lake City, Utah, where they were examined by Mike C. Rose, an employee of that agency. Mr. Rose received his bachelor of science degree in chemistry from California State College in Long Beach in 1970. During the period from 1970 through 1977, he did scientific

research at the University of Utah in Salt Lake City, receiving a master of science degree from that university in 1977 (Tr. 340). Since July of 1979, he has been employed as an analytical chemist by the Occupational Safety and Health Administration (Tr. 341). Mr. Rose is and was fully qualified to perform the test for determination of silica dust.

No purpose would be served by reciting the various steps taken in analyzing the samples for silica dust.[5] Suffice it to say that Mr. Rose, a qualified chemist, used the approved method and equipment in making his determinations. The percentage of silica contained in each of the samples taken ranged from a low of 11.36% to a high of 19.0% (Tr. 373–380). This information was recorded on the sample data sheets which were then returned to the compliance officer for his use in making computations. The compliance officer, using the formula provided in his instruction manual, then made the necessary calculations and confirmed excessive levels of silica dust which formed the basis for the issuance of the citation.

Respondent attacks the results obtained by the sampling techniques on a number of grounds, all of which relate to the compliance officer's alleged failure to strictly follow the guidelines outlined in his manual.[6] These allegations were adequately covered and explained during the course of the compliance officer's testimony and are deemed to be without merit. The procedures followed by the compliance officer were in reasonable accord with the guidelines outlined in his manual, and the results obtained are accurate.

To verify the calculations contained on the air sampling sheets, and to confirm that employees were exposed to excessive levels of silica, the Secretary called Dr. Thomas Lee Kurt, a medical toxicologist. Dr. Kurt holds degrees from six universities, including a master's degree from Harvard University School of Public Health. His credentials are impressive (Ex. C–15). Dr. Kurt checked the calculations on the air sampling sheets and reviewed their methodology based upon the guidelines established through NIOSH/OSHA for crystalline silica. In his testimony, and in his affidavit contained in the record as Exhibit C–16, Dr. Kurt confirms that the three employees in question have been exposed to excessive crystalline silica. The severity of exposure with respect to employee Mitchell is 3.24 times the level permitted under the standard. The severity of exposure with respect to Anderson is 1.43 times the permissible levels and Santacruz is 1.93. In Dr. Kurt's opinion, Mitchell, Anderson and Santacruz "are being exposed to air levels of crystalline silica that can result in serious physical harm or death" (Ex. C–16, p. 3).

Respondent also argues that the Secretary made no showing that respondent had knowledge of the "condition constituting the violation." This argument is totally without merit. Respondent, through its officials, was made aware of the situation on January 22, 1980, when the compliance officer advised its president and safety officer of the condition. Respondent, by the very nature of its operation and the regular handling, mixing and use of sand, cannot ignore the potential hazard of employee exposure to silica dust. Indeed, both the compliance officer and the Secretary's engineering expert who visited the plant noted in particular that a buildup of dust was visually observable on the persons employed around the muller (Tr. 48, 694). If respondent did not know of the hazard, it simply did not care to look.

The evidence in this case is clear and convincing that the Secretary has proved employees engaged in the muller and sand handling areas of respondent's establish-

---

5. The parties agreed at the hearing that great detail concerning the methods used in conducting the tests would be of no value to a determination in this case (Tr. 372–373).

6. These include, *inter alia*, the use of more than one filter in the testing procedure, failure to forward a bulk sample to the lab, failure to remove the testing equipment during the lunch break, etc.

ment have been exposed to silica dust in excess of permissible levels. The Secretary has, therefore, carried his burden of proof on this point. Having reached this conclusion, it now becomes necessary to determine whether or not respondent had in force a respiratory protective program as required by the standard.

While respondent had furnished employees at the time of the inspection approved respirators, there is no evidence to support a conclusion that respondent had a real respiratory protection program in effect on the day of the inspection or prior thereto. The compliance officer was told that there were no written operating standards in existence at Smith Steel Casting for the selection and use of respirators (Tr. 632). Employees were observed by the compliance officer to wear the respirators in an improper manner, which did not afford a sufficient face seal to protect employees from contaminants (Tr. 189–190). Respondent had no program in effect to monitor the respirator devices to assure that all devices were working properly (Tr. 196–197). There is no evidence that the respirators were being cleaned on a regular basis (Tr. 631). In short, respondent took no steps to protect employees from hazardous silica except to provide them with the respirators.

To abate this condition, respondent must immediately formulate and implement a responsible respiratory protection program. As outlined in the testimony of Dr. Kurt (Tr. 234), such a program would include the following:

1. The education of employees to achieve their awareness of the nature and consequences of the hazard.

2. Assurance that each employee is properly fitted with an appropriate respirator.

3. The regular care and cleaning of respirators.

4. A requirement that respirators be used at all times when employees are subject to exposure.

5. Regular inspection of the respirator to assure proper functioning.

On the same day he tested for silica dust, the compliance officer also tested for copper fumes at the location of the air-arc gouger operation. This operation entails the use of welding equipment to remove blemishes from molds and requires the use of a copper-coated electrode. Due to the intense heat generated in the operation, the copper vaporizes into a fume. Only one employee, Valentine Losorio, was engaged in this operation at the time of the inspection. This employee was wearing a welding hood for protection against heat and radiation and also a Norton 7100V dust respirator which does not protect against copper fumes (Tr. 199–200).

The testing procedure for detecting copper fumes is the same as that used for silica dust except that a different filter is used (Tr. 201). Mr. Losorio was fitted with a pump connected to a filter which was placed near his breathing zone. Three filters were used in testing for copper fumes. The first was installed at 8:39 a.m., and the third was removed at 4:27 p.m. (Tr. 203). The monitoring equipment was tested and calibrated in much the same fashion as that performed for silica dust (Tr. 205), and the same handling procedures were followed to protect the integrity of the filters while enroute to the laboratory (Tr. 205).

Ms. Candace Bliss, an employee of the OSHA laboratory in Salt Lake City, appeared at trial as the Secretary's expert in the field of analytical chemistry. Ms. Bliss has a degree in chemistry from the University of Colorado and has previously worked as a chemist for the U.S. Geological Survey and for the U.S. Environmental Protective Agency (Tr. 285–286). Following the usual and accepted procedures, she analyzed the samples submitted for copper content (Tr. 291). The results obtained from her analysis of the samples in question were recorded on the sample data sheet (Ex. C–14; Tr. 322) which was then returned to the compliance officer (Tr. 323). Using the data provided by the laboratory, the compliance officer computed the time-weighted average

of exposure to copper fumes (Tr. 207). These calculations indicate an exposure of 0.143 milligrams per cubic meter as opposed to a permissible exposure limit of 0.100 allowed by the standard (Ex. C–14). Thus, the employee had been exposed to a level of copper fumes 1.43 times the permitted level (Tr. 208).

Respondent makes the same arguments with respect to procedures followed in sampling for copper as were advanced in the case of silica dust, none of which have merit. The compliance officer followed the procedures outlined in his manual. He took all necessary steps to preserve the integrity of the filter and the accuracy of his results.

### Engineering Controls

In addition to the implementation of an effective respiratory protection program, the Secretary seeks to require respondent to implement engineering controls [7] under the provisions of 29 C.F.R. § 1910.1000(e). These controls are mandated only where such controls are "feasible," and it is the Secretary's burden to establish "feasibility." *GAF Corporation*, 81 OSAHRC 29/A2, 9 BNA OSHC 1451, 1981 CCH OSHD ¶ 25,281 (No. 77–1811, 1981).

To meet this burden, the Secretary called as an expert witness Mr. Robert Ressel, an engineer employed by PEDCO Environmental Company (Tr. 685). Mr. Ressel holds both a bachelor's degree in mechanical engineering and a master's degree in environmental engineering from the University of Texas. He is a member of the Air Pollution Control Association and has done work in the filed of conceptual design in environmental control (Ex. C–35). While his experience in foundries is rather limited, his overall experience in designing ventilation systems is extensive.

At the request of the Secretary, Mr. Ressel conducted a survey of respondent's establishment on March 10, 1981. He observed the operation in the sand muller area and in the sand handling area, as well as in the area where the air-arc gouger was being used (Tr. 693–695). After collecting the data at the on-site inspection, he then contacted manufacturers of the sand muller in use at Smith Steel and talked with them about the availability of ventilation systems to curtail air contaminants in the sand muller and sand handling areas (Tr. 709–710). He also consulted various scientific treatises relating to industrial ventilation and came up with two possible approaches for controlling dust and fume emissions in the areas in question (Tr. 710). He then prepared an evaluation of engineering controls to reduce work exposure to silica dust and copper fumes, which is contained in the record as Exhibit C–36.

The first proposed system to control the silica dust would be an enclosed, automated sand handling procedure which Mr. Ressel believes would significantly reduce the exposure of employees to this contaminant. This system would require a pneumatic conveying system, automatic muller controls, a bag unloading station, a three-ton additive silo, a 100–ton white sand silo, a 200–ton recycling sand silo, and a muller ventilation system. The system would cost approximately $281,000 to install and would cost approximately $11,000 per year to operate.

A second, less expensive system would use the existing equipment with modifications. This would require the installation of a ventilation system on the muller shield, a ventilation hood near the tipple bucket, and an increased flow of general ventilation of air in the area. This system would cost approximately $147,000 to install and would have an annual operating cost of $8,500.

In the expert's opinion, the use of either of these systems would significantly reduce the exposure of employees to silica dust (Tr. 723) perhaps to the permissible levels contained in the standard (Tr. 724).

---

7. The standard also provides for "administrative" controls, but the Secretary offered no evidence in this regard.

Mr. Ressel also proposes controls to protect the air-arc operator from exposure to copper fumes. This system would utilize a flexible duct attached to a movable support arm and hood. A fan attached to the flexible duct would draw the fumes generated in the operation and into a particulate collector where the air would be cleaned. The system is relatively inexpensive. Installation of the system would cost approximately $8,000 and operating cost would be approximately $1,000. In Mr. Ressel's opinion, the use of this system would reduce the operator's exposure to copper fumes to within permissible limits (Tr. 727).

The crucial question in this case is whether or not the controls recommended by the Secretary are "feasible" within the meaning of the standard. The meaning of this term has been the subject of considerable discussion in Review Commission decisions. In *Continental Can Company, Inc.*, 76 OSAHRC 109/A2, 4 BNA OSHC 1541, 1976–77 CCH OSHD ¶ 21,009 (Nos. 3973, 4397, 4501, 4853, 5327, 7122, 7910 & 7920), a case involving the noise standard, the employer conceded that excessive noise levels existed in its plants and that reduction of the noise could be achieved by engineering means. However, the employer argued that economic factors must be considered in determining whether engineering controls are feasible, and to require the implementation of these controls regardless of their cost would be arbitrary, capricious and, therefore, invalid. The Commission held that economic factors must be considered in determining whether or not controls are feasible. The Commission held the mere fact that controls may be expensive and increase production costs does not render them economically infeasible but that they "will not be required without regard to the costs which must be incurred and the benefits they will achieve." The question was again addressed in *Samson Paper Bag Co., Inc.*, 80 OSAHRC 60/A2, 8 BNA OSHC 1515, 1980 CCH OSHD ¶ 24,554 (No. 76–222, 1980). In three separate but concurring opinions, the Commission agreed that the Secretary had established technologically feasible controls

but remanded the case for further evidence on economic feasibility. Finally, in *GAF Corporation, supra,* a case involving air contaminants, the Commission reestablished the viability of both "technologically and economically feasible" controls stating that "a control is technologically feasible if it can be adapted to the employer's operation and is capable of producing a significant reduction in exposure to the particular toxic substance." However, the Commission found that the Secretary had failed to sustain his burden of proving technological feasibility since the record was void of evidence tending to establish the amount of reduction in contaminants that could be expected from the controls suggested by the Secretary, thereby avoiding the need to clearly define the term "economic feasibility."

Applying the law to the facts of this case, I find that the Secretary has established technological feasibility. Since respondent offered no expert witness of its own, the testimony of the Secretary's expert stands unrebutted. While Mr. Ressel's experience in the foundry industry is limited, he has wide experience in the field of ventilating systems. His testimony indicates, and it is logical to assume, that the design of a ventilation system for the foundry industry is not significantly different than that designed for other industries. Similar systems have been observed by the compliance officer in at least three other foundries (Tr. 659–660) and, in one instance, the compliance officer observed that the system was so effective that respirators were eliminated (Tr. 661). It is concluded that the implementation of either of the systems proposed by the Secretary's expert would significantly reduce the exposure of employees to silica dust perhaps, as indicated by the expert, to a level within the limits permitted by the standard. It is also concluded that the system proposed for the air-arc gouger operation is technically feasible, readily available to respondent, and would significantly reduce exposure of employees to toxic fumes.

It is further concluded that the Secretary has established the proposed controls are economically feasible. The evidence reflects, during the year preceding the inspection, respondent had a gross income of $7,096,499.55 with a net profit of $480,-316.85 (Respondent's Answers to Complainant's Interrogatories, Nos. 4 & 6; Judge's Exhibit J–18). Except for the introduction of these figures, counsel for the Secretary made no further effort to establish the economic ability of the respondent to implement the controls. By the same token counsel for respondent did not see fit to offer any evidence on this point, and no showing was made that the respondent is unable to afford the controls. In the absence of a showing that implementation of the controls are beyond the financial means of the respondent and, in view of the obvious benefits to be derived by reducing to a significant degree the exposure of employees to toxic substances, it is concluded the Secretary has carried his burden.

To abate the existing situation regarding silica dust and copper fumes, the respondent must immediately formulate a plan to reduce the level of these contaminants through the use of engineering controls. While the systems recommended by the Secretary's expert appear to address the problem, the respondent has the option of implementing these systems or devising and implementing systems of its own provided respondent's systems have the effect of significantly reducing the level of air contaminants. Respondent shall have a period of three months from the date of this decision to implement these controls.

### FINDINGS OF FACT

1. This action is a proceeding under the provisions of the Occupational Safety and Health Act, 29 U.S.C. § 651, *et seq.*

2. Respondent, Smith Steel Casting Company, is engaged in the production of iron castings at a foundry located in Marshall, Texas, and has employees who handle or otherwise work on goods that are shipped in interstate commerce.

3. On February 26, 1980, a compliance officer of the Occupational Safety and Health Administration conducted tests at respondent's establishment to determine whether employees were exposed to excessive noise levels. Dosimeters were attached to four employees and were periodically checked throughout the day. The readings obtained by the dosimeter were confirmed by spot checks of these employees with a sound level meter.

4. The testing was conducted in accordance with approved procedures. The results obtained from this testing confirm that at least four of respondent's employees were exposed to noise levels in excess of that permitted by 29 C.F.R. § 1910.-95(b)(3).

5. At the time of the inspection, respondent had provided approved earplugs for employees but did not have a hearing conservation program in effect.

6. On February 27, 1980, the compliance officer conducted tests to determine if employees working in the muller area were exposed to dust containing silica in amounts exceeding the limits prescribed in 29 C.F.R. § 1910.134. The testing was conducted in accordance with approved procedures, and the results of these tests confirm the exposure of employees to silica dust in excess of the allowable limits.

7. While respondent provided employees in the muller area with respirators approved by the National Institute of Safety and Health for this type of contaminated atmosphere, respondent did not have an adequate respiratory protection program in effect at the time of the investigation.

8. One employee engaged in the air-arc gouger operation was tested for exposure to copper fumes. The testing was conducted in accordance with approved procedures, and the results of the tests indicate this employee was exposed to excess levels of copper. This employee was not provided with a proper respirator for the protection against copper fumes.

9. The evidence reflects that respondent had knowledge of all the conditions described above.

10. The evidence in this case establishes that the implementation of engineering controls to protect employees from air contamination is feasible within the meaning of 29 C.F.R. § 1910.1000.

### CONCLUSIONS OF LAW

1. Respondent is an employer engaged in a business affecting commerce, and the Occupational Safety and Health Review Commission has jurisdiction of this case.

2. Respondent has violated the provisions of 29 C.F.R. § 1910.95(b)(3) by exposing employees to noise in excess of the levels permitted by the standard, and by failure to implement a continuing and effective hearing conservation program.

3. Respondent has violated the provisions of 29 C.F.R. § 1910.134 by exposing employees to levels of silica dust and copper fumes in excess of the limits provided by the standard.

4. Respondent has violated the provisions of 29 C.F.R. § 1910.1000 by failure to implement engineering controls to significantly reduce the exposure of employees to silica dust and copper fumes. The implementation of these controls is technologically and economically feasible within the meaning of the standard.

### ORDER

It is hereby ORDERED:

1. Serious Citation No. 1, item 1, is affirmed but the classification of "serious" is reduced to "other" with no penalties assessed.

2. Serious Citation No. 1, items 2(a), 2(b), 2(c), 2(d), 2(e), 2(f) and 2(g) are affirmed and a penalty of $640 is assessed. To abate this condition, respondent shall, within three months of the date of this order, implement engineering controls to significantly reduce the level of exposure of employees to silica dust and copper fumes.

3. Citation No. 2 is affirmed with no penalty assessed.

/s/ EDWIN G. SALYERS
Judge

Date: November 30, 1982.